Lawrence R. JONES; Dempsey Orndoff; Glen Averill; Raymond Lyons; Charles Harris; Richard Jones, Plaintiffs–Appellants,

v.

Edward W. MURRAY, Director of Department of Corrections; Paul B. Ferrara, Director of Division of Forensic Science, Defendants–Appellees.

No. 91–6057.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 28, 1991.

Decided April 7, 1992.

As Amended April 27, 1992.

Harold Jonathan Krent, Post Conviction Assistance Project, University of Virginia School of Law, Charlottesville, Va., argued (James T. McLaughlin, Philip J. Paseltiner and Pamela Vernon, Third–Year Students, on brief), for plaintiffs-appellants.

Mark Ralph Davis, Asst. Atty. Gen., Public Safety & Economic Development Div., Richmond, Va., argued (Mary Sue Terry, Atty. Gen., on brief), for defendants-appellees.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

Section 19.2–310.2 of the Virginia Code, effective July 1, 1990, requires convicted felons to submit blood samples for DNA analysis "to determine identification characteristics specific to the person" and provides for the creation of a data bank of the information for future law enforcement purposes. Six inmates have challenged the statute's constitutionality, contending that it authorizes the involuntary extraction of blood in violation of the Fourth Amendment prohibition against unreasonable searches and seizures. They also contend the statute violates the *Ex Post Facto* Clause principally because it defers until receipt of a blood sample the release of inmates who committed crimes before the statute's effective date.

On cross-motions for summary judgment, the district court upheld the constitutionality of the Virginia statute against both attacks. In the inmates' appeal, which presents a case of first impression for us, we affirm except to the limited extent that the statute purports to authorize a modification of mandatory parole conditions for prisoners incarcerated on July 1, 1990.

### I

Deoxyribonucleic acid (DNA) is a complex molecule which is found in the nuclei of human cells and carries a person's genetic information. A molecule of DNA is comprised of two nucleotide strands coiled around each other and connected by rungs, like a twisted ladder. The strands and rungs link thousands of small components which exist in a number of biochemical variations and are arranged differently for every individual except for identical twins.

At present, the white blood cells are the most commonly used source for the extraction and analysis of human DNA.

Improved scientific technology has prompted efforts to use the individuality of a person's DNA in the context of criminal law enforcement. The method for "typing" DNA known as the "DNAPrint" test is favored by the Commonwealth of Virginia and is currently being used elsewhere with varying degrees of success for criminal identification. This scientific process for analyzing DNA produces a "print" which contains a pattern of bands that is supposed to be unique to a particular person's DNA. One potential use for this print would be to compare it with an analysis of DNA material found at a crime scene as a means of identifying or exonerating a particular criminal suspect. Commonwealth officials claim that material susceptible to DNA analysis, including blood, skin tissue, hair follicles, and semen, may be found at thirty per cent of all crime scenes. Another application might involve use of the print for identifying a criminal suspect who has attempted to alter and conceal his or her identity and who had previously provided a sample to a DNA data bank.

In 1990, the Commonwealth of Virginia by statute established a DNA data bank and procedures for the collection, analysis, and exchange of DNA information for the purpose of criminal law enforcement. *See* Va.Code Ann. §§ 19.2–310.2 through 19.2–310.7 (Michie 1990). Commonwealth officials say that the program attempts to address the problem of felony recidivism in Virginia by identifying and increasing the likelihood of convicting repeat offenders and by deterring those who might otherwise commit a second felony. According to a study of violent felons convicted in Virginia between 1985 and 1987, 36.4% had at least one prior conviction for a felony. Only 26% had no prior criminal record and just over 19% had previously been convicted of nonviolent felonies. A United States Department of Justice survey of more than half of those persons released from the

prisons of eleven states in 1983 revealed that an estimated 62.5% were arrested again for a felony or serious misdemeanor within three years after release.

The 1990 Virginia law provides that incarcerated felons shall provide the Commonwealth with a blood sample for DNA analysis and storage. Va.Code Ann. § 19.2–310.2. The provision applies to (1) all persons convicted of a felony on or after July 1, 1990; (2) all felons incarcerated as of that date; and (3) all sex offenders convicted under §§ 18.2–61 through 18.2–68 of the Virginia Code, and incarcerated on July 1, 1989.[1] The law authorizes the release of DNA information to "federal, state and local law-enforcement officers upon request made in furtherance of an official investigation of any criminal offense," *see* Va.Code Ann. § 19.2–310.5, but also establishes as a crime the unauthorized dissemination or use of information from the data bank, *see* Va.Code Ann. § 19.2–310.6. The collection of DNA samples is assigned to the Virginia Department of Corrections and the tasks associated with the DNA analysis and maintenance of the data bank are to be conducted by the Virginia Bureau of Forensic Science.

In implementing the program, the Department of Corrections established procedures by which blood samples would be drawn from those inmates falling within the scope of § 19.2–310.2. With regard to felons entering state correctional facilities on or after July 1, 1990, the department's guidelines require the chief nurse at reception and classification centers to "cause an additional sterile sample of blood to be drawn at the time routine blood samples are taken for intake physicals." In addition, the department requires "[e]very felon who is in custody on or after July 1, 1990, and has not previously provided a sample of blood for DNA testing purposes, [to] provide a blood sample prior to the individual's discretionary parole eligibility date (or thirty days prior to the mandatory

---

**1.** Although § 19.2–310.2 also requires felons convicted on or after July 1, 1990, but not sentenced to a term of confinement to submit to a blood test as a condition of their sentence, that requirement is not challenged in this case.

parole ·date if the discretionary date has passed)."

On October 9, 1990, six inmates at the Tazewell Correctional Unit Number 31 challenged the implementation of the DNA program in an action filed pursuant to 42 U.S.C. § 1983 against Edward Murray, the Director of the Virginia Department of Corrections and Paul Ferrara, the Director of the Bureau of Forensic Science. The inmates requested a temporary restraining order and a preliminary injunction, as well as class certification for those individuals who have been or will be convicted of a felony under the laws of Virginia and who will be subjected to blood testing for DNA analysis. The inmates principally complained that Virginia's program is unconstitutional on three grounds: 1) the collection and analysis of blood samples violates the inmates' Fourth Amendment rights; 2) the retroactive imposition of the blood test requirement as a condition of release, including release under mandatory parole, violates the Constitution's *Ex Post Facto* Clause; and 3) the imposition of a blood-test condition on the inmates' release date interferes with a vested liberty interest and violates the Fourteenth Amendment's Due Process Clause. The district court denied the requests for preliminary relief, but on October 26, 1990, certified a plaintiff class.

On March 4, 1991, on cross-motions for summary judgment the court decided the Fourth Amendment question in favor of the Virginia officials. 763 F.Supp. 842. The court held that blood testing of incarcerated felons for the purpose of future identification falls within the Supreme Court's "special needs" exception to the Fourth Amendment's warrant requirement. Balancing the state interest in establishing the DNA bank against the intrusion upon the inmates' privacy interest, the court determined that the taking of blood samples under these circumstances is reasonable. The district court further held that the blood test requirement does not violate the *Ex Post Facto* Clause, because it is neither a punitive measure nor a requirement of parole eligibility, and the inmates' parole is not affected. Rather, it concluded, release from prison is simply deferred until the

blood· sample is provided. Finally, the district court concluded that an inmate's release date does implicate a protected liberty interest and thus a "prisoner must be given some process before he is held beyond his established parole release date." Neither party appealed the district court's decision with respect to the Due Process issue.

## II

■ The principal argument advanced by the inmates is grounded on the contention that Virginia's blood testing program violates the .inmates' Fourth Amendment rights against unreasonable searches and seizures by authorizing the search of their bodies in the absence of any individualized suspicion. They argue that the general purpose of enforcing the law by improving methods of identification is not sufficient to justify testing an entire class of people merely because the recidivism rate is higher for them. They note that several classifications of persons, for example, those affected by mental disease or environmental factors, who have never before been convicted of a crime, might statistically be equally likely to commit future crimes. They contend that the district court's ruling sustaining the Virginia program is "the first instance ... that a pure law enforcement search has ever been sustained in the absence of· *any* individualized suspicion."

The Commonwealth of Virginia observes that if individualized suspicion must exist before any felon can be required to submit to a blood test, any meaningful DNA identification bank will be impossible. The very idea of establishing a data bank refutes the possibility of establishing individualized suspicion because the collection of the blood samples is designed to solve future cases for which no present suspicion can exist. It argues that the special needs of the government warrant application of the balancing test identified in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National·Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). When considering the minimal level of intrusion, the Common-

wealth argues, demonstrably higher rates of recidivism among felons and the improved methods of identification provided by DNA analysis justify the search. They refer to studies, including one which concluded:

Of the 108,580 persons released from prisons in 11 states in 1983, representing more than half of all released State prisoners that year, an estimated 62.5% were arrested for a felony or serious misdemeanor within 3 years.... Before their release from prison, the prisoners had been arrested and charged with an average of more than 12 offenses each; nearly two-thirds had been arrested at least once in the past for a violent offense; and two-thirds had previously been in jail or prison.... An estimated 22.7% of all prisoners were rearrested for a violent offense within 3 years of their release.

Allen J. Beck & Bernard E. Shipley, U.S. Dep't of Justice *Recidivism of Prisoners Released in 1983* 1 (1989). In Virginia the statistics are not significantly different. *See* Department of Criminal Justice Services, Commonwealth of Virginia *Violent Crime in Virginia* 30–31 (May 1989).

It appears to be established, at least with respect to free persons, that the bodily intrusion resulting from taking a blood sample constitutes a search within the scope of the Fourth Amendment. *See Skinner*, 489 U.S. at 616, 109 S.Ct. at 1412; *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). And in the view of the inmates, all governmental searches conducted in the context of criminal law enforcement require individualized suspicion to satisfy the Fourth Amendment's requirement of reasonableness. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968).

■ We have not been made aware of any case, however, establishing a per se Fourth Amendment requirement of probable cause, or even a lesser degree of individualized suspicion, when government officials conduct a limited search for the purpose of ascertaining and recording the identity of a person who is lawfully confined to

prison. This is not surprising when we consider that probable cause had already supplied the basis for bringing the person within the criminal justice system. With the person's loss of liberty upon arrest comes the loss of at least some, if not all, rights to personal privacy otherwise protected by the Fourth Amendment. Thus, persons lawfully arrested on probable cause and detained lose a right of privacy from routine searches of the cavities of their bodies and their jail cells, *see Bell v. Wolfish*, 441 U.S. 520, 559–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979), as do convicted felons, *see Hudson v. Palmer*, 468 U.S. 517, 530, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984). Even probationers lose the protection of the Fourth Amendment with respect to their right to privacy against searches of their homes pursuant to an established program to ensure rehabilitation and security. *See Griffin v. Wisconsin*, 483 U.S. 868, 880, 107 S.Ct. 3164, 3172, 97 L.Ed.2d 709 (1987).

■ Similarly, when a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. We accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes. This becomes readily apparent when we consider the universal approbation of "booking" procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification. Thus a tax evader is fingerprinted just the same as is a burglar. While we do not accept even this small level of intrusion for free persons without Fourth Amendment constraint, *see Davis v. Mississippi*, 394 U.S. 721, 727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), the same protections do not hold true for those lawfully confined to the custody of the state. As with fingerprinting, therefore, we find that the Fourth Amendment does not require an additional finding of individualized suspicion before blood can

be taken from incarcerated felons for the purpose of identifying them.[2]

In the absence of a requirement for individualized suspicion, assuming that the Fourth Amendment continues to apply to lawfully confined prisoners, we must nevertheless determine the reasonableness of any search. We recognize that the search effected by the taking of blood samples may be considered a greater intrusion than fingerprinting. Yet blood tests are commonplace, *see Breithaupt v. Abram*, 352 U.S. 432, 436, 77 S.Ct. 408, 410, 1 L.Ed.2d 448 (1957), and the intrusion occasioned by them is "not significant." *See Skinner*, 489 U.S. at 625, 109 S.Ct. at 1417. The procedure " 'involves virtually no risk, trauma, or pain.' " *Id.* (quoting *Schmerber*, 384 U.S. at 771, 86 S.Ct. at 1836). In *Skinner*, the Supreme Court upheld a program which required mandatory blood testing of an entire class of railway employees, albeit not for law enforcement purposes. *Skinner* 489 U.S. at 634, 109 S.Ct. at 1422 (upholding drug and alcohol tests for safety reasons). In a similar vein, mandatory blood testing of all prisoners to detect the presence of the Human Immunodeficiency Virus, which causes Acquired Immune Deficiency Syndrome (AIDS), has been justified by the governmental interests in controlling AIDS in prison. *See Dunn v. White*, 880 F.2d 1188, 1196–97 (10th Cir. 1989), *cert. denied*, 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 954 (1990). These decisions instruct that blood testing can be reasonable under the Fourth Amendment, even with respect to free persons, where the slight intrusion is outweighed by the governmental interest advanced by the intrusion. *See also Von Raab*, 489 U.S. at 679, 109 S.Ct. at 1397; *Wolfish*, 441 U.S. at 560, 99 S.Ct. at 1885; *Hudson*, 468 U.S. at 529–30, 104 S.Ct. at 3201–02.

Against the minor intrusion, therefore, we weigh the government's interest in preserving a permanent identification record of convicted felons for resolving past and future crimes. It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features. Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate. The DNA, however, is claimed to be unique to each individual and cannot, within current scientific knowledge, be altered. The individuality of the DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime within samples of blood, skin, semen or hair follicles. The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.

Thus, in the case of convicted felons who are in custody of the Commonwealth, we find that the minor intrusion caused by the taking of a blood sample is outweighed by Virginia's interest, as stated in the statute, in determining inmates' "identification characteristics specific to the person" for improved law enforcement. *See* Va.Code Ann. § 19.2–310.2.

2. Because we consider the cases which involve the Fourth Amendment rights of prison inmates to comprise a separate category of cases to which the usual per se requirement of probable cause does not apply, there is no cause to address whether the so-called "special needs" exception, relied on by the district court, applies in this case. We do, however, find support for our holding in the fact that the Supreme Court has not categorically required individualized suspicion in the case of every search which advances a law enforcement objective. Only recently it concluded that a "slight" or "minimal" intrusion caused by the short stop of an automobile at a checkpoint, although directed at a class of people without individualized suspicion, may be justified as reasonable under the Fourth Amendment by a weightier interest advanced by the search. *See Michigan Dep't Of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 2488, 110 L.Ed.2d 412 (1990) (approving use of sobriety checkpoint to deter drunk driving).

The inmates argue that the usefulness of DNA as an identification technique is largely limited to violent crimes, based upon the unlikelihood of recovering from the scene of a *nonviolent* crime a DNA sample from the perpetrator that is sufficient for comparison with the suspect's DNA. According to statistics presented by the inmates, there is only a remote possibility that a nonviolent offender will commit a future violent crime which will produce sufficient DNA for an identification match. These statistics indicate that 97% of the cases in which DNA evidence was used to link a defendant with a crime involved murder or rape, and further, less than 1% of all nonviolent offenders are later arrested on murder or rape charges. They contend therefore that the DNA program cannot be justified with respect to the testing of nonviolent felons.

These numbers persuasively demonstrate, given the DNA technology that is currently available, that Virginia's interest in DNA testing is significantly more compelling with regard to those felons convicted of violent crimes than those not. However, we note that the fact that fingerprints are not found at a particular crime scene does not negate the Commonwealth's interest in fingerprinting the criminal suspect when caught. There may be uses for DNA technology other than merely verifying a suspect's presence at the scene of a crime. As we have noted, a DNA print might be used to identify a criminal suspect who has attempted to alter or conceal his or her identity. Moreover, if DNA technology becomes more common (and particularly if it is established as a reliable and judicially accepted identification tool), then it is likely that law enforcement officials will become more aware of the technology and thus more likely to make use of the DNA clues that are left as a result of crimes other than murder or rape. The effectiveness of the Commonwealth's plan, in terms of percentage, need not be high where the objective is significant and the privacy intrusion limited. *See Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 2487, 110 L.Ed.2d 412 (1990) (validating state use of roadblock to discover drunk drivers despite resulting arrest rate of only 1.5%); *Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884 (validating body cavity search of pretrial detainees despite only one instance in which an inmate was discovered attempting to smuggle contraband).

It is not for us to weigh the advantages of one method of identification over another which is selected by the Commonwealth. While greater utility for use of DNA data can be supposed when the future crime is one of violence and those crimes can statistically be related more directly to inmates now incarcerated for crimes of violence, the utility of more exact identification in all cases still justifies the minor intrusion. We therefore agree with the district court's conclusion that § 19.2–310.2 does not violate the Fourth Amendment as applied by the Fourteenth Amendment to the Commonwealth of Virginia.

### III

The inmates next argue that Virginia's statute violates the constitutional prohibition against *ex post facto* laws, principally because an enforcement mechanism of Virginia's DNA blood testing requirement appears retroactively to authorize an extension of the inmates' sentences into their period of mandatory parole. As part of its plan to establish the DNA bank, which was enacted in April 1990, Virginia requires:

> After July 1, 1990, the blood sample shall be taken [from incarcerated felons] prior to release from custody.
>
> *Notwithstanding the provisions of 53.1–159*, [the mandatory release on parole requirement], any person convicted of a felony who is in custody after July 1, 1990, shall provide a blood sample *prior to his release.*

Va.Code Ann. § 19.2–310.2 (emphasis added). Section 53.1–159, which was applicable to the sentences of the inmates incarcerated at the time § 19.2–310.2 was enacted, provides:

> Every person who is sentenced and committed under the laws of the Com-

monwealth to the Department of Corrections ... *shall be released on parole* by the Virginia Parole Board six months prior to his date of final discharge.

(emphasis added). This mandatory release provision allows only one exception: an inmate's release may be delayed up to six months, if new information is given to the Parole Board within thirty days of the scheduled release date "which gives the Board reasonable cause to believe that the release poses a clear and present danger to the life or physical safety of any person." Va.Code Ann. § 53.1–159. The inmates contend that retroactively authorizing prison officials to lengthen their sentences for failure to give blood samples constitutes an *ex post facto* punishment.

While the *Ex Post Facto* Clause provides simply and without explanation, "No State shall ... pass any ... *ex post facto* Law," U.S. Const. Art. I, § 10, cl. 1, the clause's definition is nevertheless settled. *See Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990). The prohibition against *ex post facto* laws, which "applies only to penal statutes which disadvantage the offender affected by them," *id.* 110 S.Ct. at 2718, assures that innocent conduct is not made criminal after the fact and that greater punishment is not imposed after the fact. *See Weaver v. Graham*, 450 U.S. 24, 28, 101 S.Ct. 960, 963, 67 L.Ed.2d 17 (1981). The definition is fully stated as follows:

It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time that the act was committed, is prohibited as *ex post facto*.

*Collins*, 110 S.Ct. at 2719 (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925)). The Court in *Collins* rejected broader definitions given earlier that an *ex post facto* law is one " 'in relation to the offence or its consequences,

[that] *alters the situation* of a party to his disadvantage.' " *Collins*, 110 S.Ct. at 2720 (emphasis added) (quoting *Kring v. Missouri*, 107 U.S. (17 Otto.) 221, 228, 2 S.Ct. 443, 449, 27 L.Ed. 506 (1882)).

■ Emerging clearly from this discussion is the conclusion that a statute that is not penal cannot be *ex post facto*. Thus it cannot be said that the DNA testing, itself, runs afoul of the *Ex Post Facto* Clause. We agree with the district court's finding that:

The requirement that prisoners provide blood samples is not punitive in nature.... The blood sample is taken and analyzed for the sole purpose of establishing a data bank which will aid future law enforcement.

In light of our determination that the program withstands challenge under the Fourth Amendment, the blood testing requirement legally can be implemented, and as is the case regarding any valid prison regulation, violators can be administratively punished for their failure to provide samples.

■ The *Ex Post Facto* Clause does not prevent prison administrators from adopting and enforcing reasonable regulations that are consistent with good prison administration, safety and efficiency. As we stated in *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir.1991) (en banc),

[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and denials of privileges—matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison administrators.

It is precisely because reasonable prison regulations, and subsequent punishment for infractions thereof, are contemplated as part of the sentence of every prisoner, that they do not constitute additional punishment and are not classified as *ex post facto*. Moreover, since a prisoner's original sentence does not embrace a right to one

set of regulations over another, reasonable amendments, too, fall within the anticipated sentence of every inmate. We therefore conclude that neither Virginia's blood testing requirement, itself, nor the infliction of punishment within the terms of the prisoners' original sentence for a violation of the requirement, is *ex post facto*.[3]

The inmates present a different problem, however, in challenging the apparent authority of Virginia's prison officials to enforce the blood testing requirement by deferring the inmate's release date into the mandatory parole period until the blood sample is provided. While § 53.1–159 explicitly guarantees an inmate's "release on parole[ ] ... six months prior to his date of final discharge," unless the Parole Board determines that release would constitute a "clear and present danger" to someone in the community,[4] *see* Va.Code Ann. § 53.1–159, the DNA data bank statute suggests that "[n]otwithstanding the provisions of 53.1–159," an inmate's release can be delayed until he provides a blood sample. Thus, prior to the enactment of § 19.2–310.2 every prisoner received an automatic six-month reduction of sentence unless he constituted a "clear and present danger" to society. Whereas, if § 19.2–310.2 were to be enforced to deny the prisoner that automatic release for refusing to provide a blood sample, the prisoner would be held beyond the time of release contemplated by the original sentence and a term of his sentence, thereby, would be made more onerous *ex post facto*. *See Weaver*, 450 U.S. at 36, 101 S.Ct. at 968.

In reliance on *Warden v. Marrero*, 417 U.S. 653, 661–64, 94 S.Ct. 2532, 2537–39, 41 L.Ed.2d 383 (1974), we have held that parole *eligibility* is a facet of the sentence imposed, and that, by deferring the eligibility date, the state imposed on the defendant after-the-fact punishment when denying a sentence benefit that he had at the time the offense was committed. *Schwartz v. Muncy*, 834 F.2d 396, 397–98 (4th Cir.1987). *See also Fender v. Thompson*, 883 F.2d 303, 307 (4th Cir.1989). We similarly conclude that if § 19.2–310.2 were to be enforced to deny an inmate convicted of a crime before July 1, 1990, the mandatory parole inherent in the original sentence given him, the prohibition against *ex post facto* laws would be violated.

Thus, the 1990 Virginia statute does not qualify as an *ex post facto* law with respect to its requirement that blood samples be provided by inmates or its possible effect in authorizing prison punishment, the denial of good-time credits, or consideration by the parole board in granting discretionary parole to compel the inmate to provide a sample, because it does not thereby alter any prisoner's sentence for past conduct. However, the continued incarceration beyond a time six months prior to the end of the actual sentence of an inmate convicted prior to the enactment of § 19.2–310.2, for any reason not reflected in the terms of the mandatory parole provision, would constitute a retroactive extension of the inmate's sentence which is prohibited by the *Ex Post Facto* Clause.

### IV

In summary, we agree for the most part with the district court's decision granting summary judgment to the directors of Virginia's Department of Corrections and Division of Forensic Science. Considering the inmates' questionable claim of privacy to protect their identification and the minimal

---

**3.** While we can anticipate that blood samples will be taken in a manner and under circumstances best determined by prison administrators, if prison officials compel compliance by prison punishment, loss of good-time credits, or adverse recommendations for parole, some legal process may be required. The district court already concluded that when a prisoner violates the statute and becomes exposed to disadvantagement, he "must be given some process before he is held beyond his established parole release date." That ruling has not been appeal-

ed and is not before us. Suffice it to say that whatever punishment or disadvantagement is imposed results, not by reason of conduct that took place *before* enactment of the statute, so as to become retrospective, but from conduct that occurred *after* enactment in refusing to comply with a reasonable regulation.

**4.** Not relevant to this discussion, § 53.1–159 also requires that a minimum of three months be served prior to release on mandatory parole.

intrusion resulting from taking a small sample of blood, the Commonwealth's interest in combatting and deterring felony recidivism justifies the involuntary taking of the sample and the creation of the DNA data bank as reasonable in the context of the Fourth Amendment. Furthermore, it is our conclusion that Virginia's requirement that all incarcerated felons provide a blood sample to prison medical personnel prior to the inmate's release does not constitute a retroactive increase in the sentence of any inmate in violation of the *Ex Post Facto* Clause except to the extent that the first five words of the sentence of § 19.2–310.2, providing

> *Notwithstanding the provisions. of 53.1–159*, any person convicted of a felony who is in custody after July 1, 1990, shall provide a blood sample prior to his release (emphasis added),

authorize a modification of mandatory parole. We hold that those five words therefore are unconstitutional and may not be enforced to modify the mandatory parole period. *See* Va.Code Ann. § 1–17.1 (Michie 1987) ("The provisions of statutes in this Code or the application thereof to any person or circumstances which are held invalid shall not affect the validity of other statutes, provisions or applications of this Code...."). *See also City of Portsmouth v. Citizens Trust Co.*, 216 Va. 695, 222 S.E.2d 532, 535 (1976) (severing unconstitutional mandate, even without a severability clause, because "[d]eletion of the invalid [provision did] not alter the effect of the ordinance in fulfilling the purpose expressed"). Because the purpose of combatting and deterring, recidivism through the establishment of a DNA identification program easily can be accomplished without application of the *ex post facto* sanction, we conclude that "the legislature would be satisfied with what remains after the invalid part has been eliminated." *City of Waynesboro v. Keiser*, 213 Va. 229, 191 S.E.2d 196, 200 (1972). Accordingly, the judgment of the district court is affirmed in part and reversed in part.

AFFIRMED IN PART AND REVERSED IN PART.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

To the extent that the majority opinion upholds the Virginia DNA testing procedure as applied to violent felons, and holds that the statute qualifies as an *ex post facto* law with respect to its effect on the mandatory release of prisoners convicted prior to its effective date, I concur in the decision. But I must respectfully dissent from the majority's determination of the constitutionality of the statute as applied to prisoners convicted of non-violent crimes. Prisoners do not lose an expectation of privacy with regard to blood testing, and the Commonwealth's articulated interest in the testing of non-violent felons does not counter-balance the privacy violation involved in the procedure.

I.

First, although I concur in the result as applied to felons convicted of violent crimes, I am compelled to address the majority's strikingly truncated view of the Fourth Amendment protections afforded to a convicted felon, which the majority provides as an alternative basis for its conclusion that the statute, as applied to violent felons, is valid. Having held that the Commonwealth's knowledge of the identity of those convicted of violent felonies justifies application of the statute to felons of that kind, the majority obliterates—in my mind unjustifiably—the distinction between violent and non-violent felons.

The majority, citing Supreme Court precedent, holds that a prisoner loses "some, if not all, rights to personal privacy otherwise protected by the Fourth Amendment." Maj.Op. at 308. Although it has been established that incarcerated individuals, particularly because of a partial loss of an expectation of privacy, must carry on their affairs under a significantly limited umbrella of protections against most searches, there exists no blanket authorization of searches involving intrusions under the skin, for which no individual, whether in prison or out, loses a reasonable expectation of privacy.

Prisoners most assuredly do give up specific aspects of their reasonable expectation of privacy because of practical concerns relating to living conditions, and because of the necessities involved in ensuring prison security. However, in the present case, appellants have not forfeited their expectation of privacy with respect to blood testing, and no practical penal concern justifies the departure involved in the DNA procedure. Accordingly, the Commonwealth's DNA testing procedure should be reviewed under the standard applied to a search of any individual when such a search is not based on individualized suspicion: the privacy interest of the prisoner in remaining free of bodily invasion should be balanced against the state interest in carrying out the search.

The majority cites the Supreme Court's opinion in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), to support its sweeping conclusion about the extent of prisoners' loss of privacy rights. Although *Bell* allows for certain invasive search procedures, *Bell* does not suggest that probable cause detainees have abrogated the entire panoply of privacy protections. To the contrary, the *Bell* Court reaffirms the conclusion that privacy interests of detainees or prison inmates remain, and that these privacy interests must be balanced against the "significant and legitimate security interest of the [penal] institution." *Id.* at 560, 99 S.Ct. at 1885.

The majority today implicitly holds that, whether violent or nonviolent, a prisoner loses a reasonable expectation of privacy which justifies the search in the present case. Citing *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), which held that a prisoner has no reasonable expectation of privacy in his prison cell, the majority indicates that prisoners lose the aspect of their right to privacy that protects them from routine searches.

However, the majority goes a step further by applying the *Hudson* standard to the Commonwealth's DNA procedure and implicitly holding that the lack of a reasonable expectation of privacy in a prison cell extends to permit unjustified searches of bodily fluids of every felon, violent and non-violent alike.

A prisoner certainly cannot stake a claim to the kind of sanctity of dominion to a cell that a non-incarcerated individual can to a home. Moreover, the Supreme Court has indicated that there are situations in which even a private citizen's expectation of privacy diminishes, or disappears altogether.[1] It is apparent, however, that the search involved in the present case, blood testing, violates a privacy interest that even a prisoner, living in close quarters under constant security surveillance, reasonably can expect to enjoy.

No precedential justification exists for the majority's holding that convicted felons, violent or non-violent, solely because of past criminal activity, lose the expectation that their bodily fluids will be free of unjustified search. As the Supreme Court stated in *Skinner v. Railway Labor Association*, 489 U.S. 602, 616, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989), "it is obvious that this physical invasion [a blood test] penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable." Although *Skinner* involved the testing of free citizens, its determination that an individual has a reasonable expectation of privacy within one's own body applies equally to prisoners, unless the prisoner's privacy right is incompatible with the objectives of incarceration.

The majority, by relying on *Hudson* to justify its conclusion that prisoners lose a right to privacy from routine searches, indicates that the loss of a prisoner's expecta-

---

**1.** The Supreme Court has held that individuals have a lessened expectation of privacy in regard to searches of cars and other mobile, public property because a "car ordinarily is not used as a residence or repository for one's personal effects, and its passengers and contents are generally exposed to public view." *Florida v. Jimeno,* —— U.S. ——, 111 S.Ct. 1801, 1805, 114 L.Ed.2d 297 (1991). But the Court has continually restricted the curtailment of the expectation of privacy to situations in which the property searched has a similarly public character, disallowing the use of the justification to support searches of closed containers that demonstrate an individual's intent to keep the enclosed material private. *Id.*

tion of privacy arises from the significant, if not complete, loss of constitutionally mandated privacy rights that occurs incident to incarceration. Maj.Op. at 308. The Supreme Court, however, while permitting restrictions on prisoners' privacy rights, has repeatedly reaffirmed the principle that "prisons are not beyond the reach of the Constitution," *Hudson*, 468 U.S. at 523, 104 S.Ct. at 3198, and that "prisoners [must] be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Id.* The Court has justified restrictions on prisoners' rights, specifically their expectation of privacy, by relying on practical considerations requiring additional authority on the part of prison officials to control potentially dangerous prison communities. *Id.* at 524, 104 S.Ct. at 3199. There is no such practical concern, at least not one relating to "the objectives of incarceration," involved in the Commonwealth's DNA testing program.[2] Accordingly, the majority's reliance on the *Hudson* expectation of privacy standard is misplaced.

Additionally, the majority cites *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), to support the proposition that unincarcerated convicted felons "lose their right to privacy against searches of their homes pursuant to an established program to ensure rehabilitation and security." Maj.Op. at 308. *Griffin*, however, is inapplicable to the case at hand. In *Griffin*, a Wisconsin regulation allowed any probation officer to search a probationer's home without a warrant as long as the officer's supervisor approved the search, and as long as "reasonable grounds" existed to believe that contraband would be present. Although the search authorized in that case did not require a showing of probable cause, it did require *individualized suspicion* relating

to the person searched based on a "reasonable grounds" standard. *Id.* at 871, 107 S.Ct. at 3167. As both parties concede, the DNA testing involved in the present case is not based upon any individualized suspicion of the persons tested beyond the statistical assertion that, as a group, convicted felons are somewhat more likely to commit future crimes than members of the non-felonious general population. The *Griffin* case simply does not support the majority's conclusion that all convicted felons, both violent and non-violent, may be made subject to random, nonparticularized searches merely because of their past illegal acts. Justification for searches of these individuals must be based, as must all searches of citizens in a free society still clinging to disappearing Fourth Amendment protections, on a balancing of the privacy interest involved against the state interest in the search to determine which interest is more compelling. *See Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990). It is with a reasoned application of the *Sitz* standard, and not with a disturbing restriction of the Fourth Amendment protections afforded to the nation's prisoners, that the DNA testing procedure, as applied to felons convicted of violent crime, may be justified.

## II.

The DNA testing of felons convicted of non-violent crimes is not justified, given the limited and non-compelling state interest in including them in the testing procedure. The only state interest offered by the Commonwealth for including non-violent felons is administrative ease. I cannot conclude that the government interest in administrative ease suffices to outweigh a prisoner's expectation of privacy in not having blood withdrawn from his body when that prisoner is not significantly more likely to commit

---

**2.** The majority, in two separate instances, asserts that one of the Commonwealth's interests in instituting a DNA data bank is to identify persons who are incarcerated. Maj.Op. at 308. Nowhere in the record on appeal has the Commonwealth suggested that its intent in the creation of the data bank is related to the identification of prisoners for any institutional penal

purpose. The only stated justification for creation of the bank is the facilitation of future law enforcement. Therefore, the search involved here in the blood testing of potential future criminals is significantly more akin to the gathering of evidence to support conviction at trial than to the activity of identifying felons within a prison facility.

a violent crime in the future than a member of the general population.

The Commonwealth, in its Report of the Joint Subcommittee Studying Creation of a DNA Test Bank, Senate Report No. 29 (January 1, 1990), concluded only that "the recidivism data supported the inclusion of plaintiffs convicted for felony sex offenses, assault, capital murder, first and second degree murder, voluntary manslaughter, larceny and burglary." Nonetheless, it also recommended the testing of *all* remaining felons, *not* because such testing would be likely to help solve crimes, but only because their inclusion would make the data bank "more efficient and cost effective." [3]

Thus, the Commonwealth's expressed, primary legitimate interest in testing nonviolent felons is not based on law enforcement concerns, but on a priority for saving the limited extra funds that would be necessary to determine which of the incarcerated prisoners were appropriate for DNA testing. Such a justification for testing nonviolent felons is based on a tenuous state concern that could just as readily justify the testing of any citizen, as long as the inclusion of that individual served to lessen the Commonwealth's administrative workload.

The Commonwealth's DNA testing procedure, as applied to nonviolent felons, will have a significantly limited effect in actually solving future crimes. The district court misapprehended the potential effectiveness of the DNA testing procedure as related to non-violent felons. The court indicated its belief that the testing procedure could be used to facilitate perpetrator identification in up to 30% of cases because a significant specimen of blood or other bodily fluids is likely to be left at 30% of violent crime scenes. Yet both government and independent studies in the record show that, overall, remarkably few crime scenes contain specimens from the perpetrator capable of facilitating DNA matching, and that very few types of crimes are likely to produce sufficient information. One study, cited in the majority opinion, Maj.Op. at 310, found that 194 of the 200 cases (97%) in which DNA evidence was available to link the defendant with the crime involved murders or rapes.

The record supports appellants' contention that there is an extremely tenuous link connecting persons convicted of non-violent felonies to the commission of future violent crime. It, therefore, contains nothing to substantiate a theory that DNA testing of non-violent felons would assist in solution of future crimes. United States Justice Department statistics provided in the record show that only %0.4 of non-violent felons are later arrested on rape charges, and only %0.8 are later arrested on murder charges. One might assume non-violent drug offenders would be more likely to commit violent crime subsequent to release than other non-violent felons; yet, only %0.4 of them are later arrested for rape, and %0.3 for murder.

The record does not provide similar percentage statistics for the general population. It can be readily inferred that the testing of all citizens, regardless of criminal record, would create a DNA data bank with a similar statistical likelihood of solving future crime as is provided by the testing of non-violent felons. Additionally, the testing of other discrete populations, *e.g.*, racial minorities or residents of underprivileged areas, might produce significantly better statistics than %0.4.[4]

Lacking a significant statistical likelihood to justify the inclusion of non-violent felons, the Commonwealth is forced to justify the inclusion of these individuals based

---

**3.** That approach would permit DNA testing of *all* citizens at birth, though violence had not yet manifested itself, as justification for the consequent invasion of privacy.

**4.** An argument can be made that there is little likelihood that a statesponsored program to create a DNA data bank of all racial minorities could survive an equal protection challenge, but it is clear that a similar program targeted at underprivileged citizens, having a disparate impact on these same minorities, would not be subject to equal protection analysis, given the non "suspect" nature of wealth-based classifications. *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973).

on its amorphous concern for administrative efficiency. In order to withstand appellants' challenge to the constitutionality of the inclusion of non-violent felons in the DNA testing procedure, the Commonwealth is required to articulate an important state interest justifying the privacy intrusion.[5] The majority, without any reference to the Commonwealth's actual expressed interest, offers an alternative means to support the inclusion of non-violent felons: "if DNA technology becomes more common ..." it will become more likely that DNA clues will be "left as a result of crimes other than murder or rape." Maj. Op. at 310-11. The majority's proffered justification denies the Commonwealth's own conclusion that the recidivism data did *not* support inclusion of anyone other than violent criminals, and directly ignores the actual stated reason for the inclusion, namely that testing all felons would be "more efficient and cost effective." Therefore, the majority opinion, by implicitly approving the Commonwealth's stated justification, leads me to a deep, disturbing, and overriding concern that, without a proper and compelling justification, the Commonwealth may be successful in taking significant strides towards the establishment of a future police state, in which broad and vague concerns for administrative efficiency will serve to support substantial intrusions into the privacy of citizens.

We should be extremely careful, of course, when we endeavor to replace our judgment for that of elected officials. In the case at hand, the relative lack of situations where DNA evidence obtained from any felon will be useful in solving crimes suggests the possibility that the DNA test-

ing program will prove perhaps, ill-advised as a public policy matter. Yet the determination of the value of any law enforcement program rests almost exclusively with the legislature. To the extent that the Commonwealth's testing program, which causes a violation of individual privacy rights, also serves to promote an important government interest with at least a reasonable claim to potential effectiveness, we have no choice but to uphold the practice. *See Sitz*, 110 S.Ct. at 2488. In the present case, to the extent that the statute applies to felons convicted of violent crimes, there is a sufficiently reasonable connection between the DNA testing procedure and the government interest in better identifying future criminals to withstand a constitutional challenge to the statute. Accordingly, I concur with the result reached by the majority as to the statute's application to felons convicted of violent crimes after the effective date of the statute.

However, to the extent that the statute applies to non-violent felons, the Commonwealth's own report and express justification, as well as statistical evidence in the record, readily show that the specific rationale for testing such individuals is administrative ease. This questionable government interest [6] is not sufficient, in my view, to justify the intrusion involved here. For the foregoing reason, I would hold the statute constitutionally invalid as applied to those appellants, and others similarly situated, who are felons convicted of non-violent crimes.

---

**5.** Though not conclusively determined, recent federal court precedent indicates that "in deciding whether an intrusion into an individual's privacy is justified [the facts to be considered should include] ... whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating towards access." *Fraternal Order of Police, Lodge 5 v. Philadelphia*, 812 F.2d 105, 110 (3rd Cir. 1987). In the absence of such an express mandate or articulated public policy, I find it inappropriate for the majority, or any appellate court, to inject a "recognizable" interest where none is offered by the government or available

in the record on appeal, particularly when, as here, the state interest that is proffered and promoted does not justify the invasion of privacy.

**6.** I consider the interest questionable, additionally, because it is unlikely that a significant administrative burden will result if the Commonwealth is forced to separate the prisoners convicted of violent felonies from those convicted of non-violent felonies prior to conducting the DNA testing.