No. 87,918

STATE OF KANSAS, *Appellee*, v. JAMES E. MAASS, *Appellant*.

64 P.3d 382

Opinion filed March 7, 2003.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

KNUDSON, J.: James Maass appeals from the district court's order requiring that specimens of his blood and saliva be submitted to the Kansas Bureau of Investigation (KBI). Maass contends the court lacked statutory authority to enter the order or, in the alternative, that the application of K.S.A. 2001 Supp. 21-2511 in his case is unconstitutional. Upon motion, this appeal has been transferred from the Court of Appeals to the Supreme Court. See K.S.A. 20-3018(c).

We affirm. We hold: (1) K.S.A. 2001 Supp. 21-2511 does not constitute an unreasonable infringement upon the defendant's right of privacy or constitutional protection from an unreasonable search and seizure; (2) K.S.A. 2001 Supp. 21-2511 does require Maass to provide blood and saliva specimens; and (3) the district court's order requiring blood and saliva specimens does not infringe upon Maass' right of privacy or constitute an unreasonable search and seizure.

Maass committed a nonresidential burglary and theft on June 8, 2001, and was convicted on August 16, 2001. K.S.A. 2001 Supp. 21-2511(a) provides, in material part, that any person convicted of a nonresidential burglary shall be required to submit specimens of blood and saliva to the KBI. Prior to the legislature's 2001 amendment, K.S.A. 21-2511(a) was more discrete, directed at persons who committed certain enumerated crimes, primarily murder and sex offenses. Parenthetically, the statute was amended again in 2002 and now includes all felonies. See K.S.A. 2002 Supp. 21-2511(a). At sentencing, Maass objected to providing the KBI with specimens of his blood and saliva, contending K.S.A. 2001 Supp. 21-2511 could only be given prospective application, applying to

crimes occurring on or after July 1, 2001. The district judge over-ruled Maass' objection, stating: "I'm taking the position that there is a retroactive application, or that it applies to sentencings that take place after July 1st of 2001, notwithstanding the fact that the offense may have occurred prior to that date." The court ordered Maass to provide specimens to the KBI.

Maass' claim requires interpretation of K.S.A. 2001 Supp. 21-2511(a), which states:

"(a) Any person convicted as an adult or adjudicated as a juvenile offender because of the commission of any offense which requires such person to register as an offender pursuant to the Kansas offender registration act, K.S.A. 22-4901 *et seq.*, any off-grid felony, any nondrug severity level 1 through 6 felony, or a violation of subsection (a)(1) of K.S.A. 21-3505, 21-3508, 21-3602, 21-3715, 21-4310, subsections (e)(2), (e)(3) and (e)(4) of K.S.A. 65-4142 or K.S.A. 65-4159, and amendments thereto, including an attempt, conspiracy or criminal solicitation, as defined in K.S.A. 21-3301, 21-3302 or 21-3303 and amendments thereto, of any such offenses provided in this subsection regardless of the sentence imposed, shall be required to submit specimens of blood and saliva to the Kansas bureau of investigation in accordance with the provisions of this act, if such person is:

(1) Convicted as an adult or adjudicated as a juvenile offender because of the commission of a crime specified in subsection (a) on or after the effective date of this act;

(2) ordered institutionalized as a result of being convicted as an adult or adjudicated as a juvenile offender because of the commission of a crime specified in subsection (a) on or after the effective date of this act; or

(3) convicted as an adult or adjudicated as a juvenile offender because of the commission of a crime specified in this subsection before the effective date of this act and is presently confined as a result of such conviction or adjudication in any state correctional facility or county jail or is presently serving a sentence under K.S.A. 21-4603, 22-3717 or 38-1663, and amendments thereto."

Interpretation of a statute is a question of law, and an appellate court's review is unlimited. An appellate court is not bound by the district court's interpretation of a statute. *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000). When a statute is plain and unambiguous, the court's duty is to respect the intention of the legislature as expressed. *State ex rel. Stovall v. Meneley*, 271 Kan. 355 , 378, 22 P.3d 124 (2001).

Under our stated canons of review, we need not go beyond the plain and unambiguous language of the statute. Under K.S.A. 2001

Supp. 21-2511(a)(1), it is the date of *conviction* that controls, not the date the crime was committed. Thus, Maass' first argument to support his claim of error by the district court must fail.

We note Maass' tangential claim that the collection, analysis, and storage of blood and saliva samples under K.S.A. 2001 Supp. 21-2511 constitutes a penalty and cannot be applied retroactively to a crime committed before the statute was amended. We have no quarrel with the proposition that the criminal penalty to be applied must be as it stood on the date the crime was committed. See *State v. Patterson*, 25 Kan. App. 2d 245, 252-53, 963 P.2d 436, *rev. denied* 265 Kan. 888 (1998). However, the provisions of K.S.A. 2001 Supp. 21-2511 do not constitute a penalty but are intended to assist law enforcement agencies in the identification and detection of crimes and offenders. State action in furtherance of achieving those goals is not a penalty or punishment.

For the foregoing reasons, we conclude that although the district court erred in concluding K.S.A. 2001 Supp. 21-2511 should be applied retroactively, the court came to the correct conclusion that Maass should be ordered to provide specimens. See *Bergstrom v. Noah*, 266 Kan. 847, 875-76, 974 P.2d 531 (1999).

Maass raises for the first time on appeal a claim that, as applied to him, K.S.A. 2001 Supp. 21-2511 is unconstitutional, violating his right of privacy and subjecting his person to an unreasonable search and seizure. Ordinarily, an issue not presented to the district court will not be considered on appeal. *State v. Mincey*, 265 Kan. 257, 266-67, 963 P.2d 403 (1998). However, an appellate court may decide to consider such an issue when arising on admitted facts and where resolution of the issue will serve the ends of justice. 265 Kan. at 267. We conclude Maass' claim comes within this recognized exception and should be considered on its merits.

The constitutionality of K.S.A. 21-2511 prior to the 2001 amendment was upheld in *Schlicher v. Peters*, 103 F.3d 940, 943 (10th Cir. 1996). In *Schlicher*, the court relied upon the holdings in *Boling v. Romer*, 101 F.3d 1336 (10th Cir. 1996), *Jones v. Murray*, 962 F.2d 302 (4th Cir.), *cert. denied* 506 U.S. 977 (1992), and *Rise v. Oregon*, 59 F.3d 1556 (9th Cir. 1995), *cert. denied* 517 U.S. 1160 (1996).

In *Boling*, the court noted:

"In *Jones*, the Fourth Circuit rejected a Fourth Amendment challenge to a Virginia statute requiring all convicted felons to submit blood samples for DNA analysis and inclusion in a data bank for future law enforcement purposes. In reaching that conclusion, the court determined there is no 'per se Fourth Amendment requirement of probable cause, or even a lesser degree of individualized suspicion, when government officials conduct a limited search for the purpose of ascertaining and recording the identity of a person who is lawfully confined to prison.' [Citation omitted.] The [*Jones*] court relied in part on an inmate's diminished expectation of privacy in the prison setting.

" '[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. We accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes. This becomes readily apparent when we consider the universal approbation of "booking" procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification. Thus a tax evader is fingerprinted just the same as is a burglar. While we do not accept even this small level of intrusion for free persons without Fourth Amendment constraint, *see Davis v. Mississippi*, 394 U.S. 721, 727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), the same protections do not hold true for those lawfully confined to the custody of the state. As with fingerprinting, therefore, we find that the Fourth Amendment does not require an additional finding of individualized suspicion before blood can be taken from incarcerated felons for the purpose of identifying them.' [Citation omitted.]" 101 F.3d at 1339.

The *Jones* court held, after balancing the minimal intrusion caused by the blood sampling against the government's interest in making a permanent identification record of convicted felons for the purpose of resolving future crimes, DNA sampling was a reasonable search within the meaning of the Fourth Amendment to the United States Constitution. 962 F.2d at 307.

The *Boling* court also noted the Ninth Circuit Court of Appeal's decision in *Rise* in which it equated "everyday 'booking' procedure" and DNA sampling. 101 F.3d at 1340.

"The Ninth Circuit first examined the plaintiffs' separate interests in the privacy of the DNA information and their interest in bodily integrity. [Citation omitted.] The *Rise* court noted that '[t]he information derived from the blood sample is substantially the same as that derived from fingerprinting—an identifying marker unique to the individual from whom the information is derived.' [Citation omit-

ted.] Noting that 'everyday "booking" procedures routinely require even the merely accused to provide fingerprint identification, regardless of whether the investigation of the crime involves fingerprint evidence,' the [*Rise*] court concluded that '[o]nce a person is convicted of one of the felonies included as predicate offenses under [the Oregon statute], his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from the blood sampling.' [Citation omitted.] The *Rise* court then found that although obtaining DNA information requires drawing blood as opposed to 'inking and rolling a person's fingertips,' [citation omitted], that difference does not render the intrusion on Fourth Amendment interests more than minimal. [Citations omitted.]

"The *Rise* court then balanced the minimal intrusion on Fourth Amendment interests against the legitimate government interest in identifying and prosecuting murderers and sex offenders, the degree to which gathering the DNA information would advance that interest, 'and the severity of the resulting interference with individual liberty.' [Citation omitted.] Noting 'the public's incontestable interest in preventing recidivism and identifying and prosecuting murderers and sexual offenders, and the likelihood that a DNA bank will advance this interest,' the Ninth Circuit concluded that the statute was constitutional. [Citation omitted.]" 101 F.3d at 1340.

## The *Boling* court concluded:

"We are persuaded to reach the same result, with respect to the statute at issue here, as our sister circuits. We do not rely on any supposition that sex offenders are more likely to be recidivists than others, nor, as the district court did, on the penological interests within the prison. We do rely upon the specific relevance of DNA evidence to prove sexual assaults. Thus we hold that while obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights, *see Dunn v. White*, 880 F.2d 1188, 1195 (10th Cir.1989) (in upholding AIDS testings against inmates' Fourth Amendment challenge, stating that 'plaintiff's privacy expectation in his body is further reduced by his incarceration'), *cert. denied*, 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 954 (1990); the minimal intrusion of saliva and blood tests; and the legitimate government interest in the investigation and prosecution of unsolved and future criminal acts by the use of DNA in a manner not significantly different from the use of fingerprints." 101 F.3d at 1340.

Also instructive is *Gaines v. State*, 116 Nev. 359, 998 P.2d 166, *cert. denied* 531 U.S. 856 (2000). In *Gaines*, the Nevada Supreme Court passed on the constitutionality of its DNA testing collection statute. See Nev. Rev. Stat. § 176.0913 (2001). This Nevada statute

requires collection of DNA samples for persons convicted of a number of crimes, including property offenses.

On appeal, Gaines, who had been convicted of two counts of burglary and one count of forgery, challenged the constitutionality of the statutory requirement that he submit a DNA sample on numerous bases:

"Gaines launches numerous constitutional attacks on NRS 176.0913, including claims that the statute is overbroad and that it violates his right to be free from unreasonable search and seizure, right to equal protection, right to due process, and right to be free from cruel and unusual punishment. Although we will address each constitutional argument in turn, we note preliminarily that all fifty states have enacted genetic marker testing statutes, and that appellate courts considering the constitutionality of these statutes have uniformly upheld them. *See Landry v. Attorney General* 429 Mass. 336, 709 N.E.2d 1085, 1090 (1999); *see, e.g., Roe v. Marcotte*, 193 F.3d 72, 79 (2d Cir.1999); *Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir.1996); *Rise v. Oregon*, 59 F.3d 1556, 1562 (9th Cir.1995); *Jones v. Murray*, 962 F.2d 302, 308 (4th Cir.1992); *Vanderlinden v. Kansas*, 874 F.Supp. 1210, 1215 (D.Kan.1995); *Kruger v. Erickson*, 875 F.Supp. 583, 588-89 (D.Minn.1995); *Ryncarz v. Eikenberry*, 824 F.Supp. 1493 (E.D.Wash.1993); *In the Matter of Maricopa County Juvenile Auth.*, 187 Ariz. 419, 930 P.2d 496, 501 (Ct.App.1997); *People v. Wealer*, 264 Ill.App.3d 6, 201 Ill.Dec. 697, 636 N.E.2d 1129, 1137 (1994); *Cooper v. Gammon*, 943 S.W.2d 699, 705 (Mo.Ct.App.1997); *In the Matter of Marcus Orozco*, 129 Or.App. 148, 878 P.2d 432, 435-36 (1994); *State v. Olivas*, 122 Wash.2d 73, 856 P.2d 1076, 1086 (1993)." 116 Nev. at 367.

## The *Gaines* court continued:

"It is undisputed that the involuntary collection of a blood sample from an offender constitutes a warrantless 'search and seizure' for purposes of the Fourth Amendment that is not based on individualized suspicion of wrongdoing. [Citations omitted.] Given this fact, the issue then becomes whether this warrantless search is unreasonable, thereby violative of the Fourth Amendment. See *Landry*, 709 N.E.2d at 1093.

"Courts that have considered this issue have taken two differing approaches in their Fourth Amendment analysis. First, some courts have applied a balancing approach weighing both the convict's expectation of privacy and the minimally intrusive nature of a blood draw against the government's interest in creating a genetic marker database to solve future crimes. See *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir.1992); *Rise v. Oregon*, 59 F.3d 1556, 1560 (9th Cir.1995). Second, other courts have determined that genetic marker testing falls within the 'special needs' doctrine that allows searches and seizures without a warrant and

without individualized suspicion. *See State v. Olivas*, 122 Wash.2d 73, 856 P.2d 1076, 1086 (1999); *Roe v. Marcotte*, 193 F.3d 72, 79 (2d Cir.1999).

"Because we deem the reasoning in the balancing approach more persuasive, we hold that NRS 176.0913 does not violate the Fourth Amendment because the State's interest in solving crimes outweighs both the convict's diminished expectation of privacy and the minimally intrusive nature of the blood draw.

"With respect to the balancing approach, the first consideration to be balanced against the State's interest in the search and seizure at issue is the individual's expectation of privacy. Many jurisdictions have recognized that a convicted person loses some rights to personal privacy that would otherwise be protected under the Fourth Amendment:

> 'Once a person is convicted of one of the felonies [enumerated in a genetic marker testing statute] his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from the blood sampling.'

Rise v. Oregon, 59 F.3d 1556, 1560 (9th Cir.1995); *see Jones v. Murray*, 962 F.2d 302, 306 (4th Cir.1992).

"Finally, the Supreme Court of the United States has held that a convicted person has a diminished expectation of privacy in the penal context. For example, in *Hudson v. Palmer*, 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court held that persons lawfully convicted lose their right to privacy in routine searches of their jail cells. *See Hudson*, 468 U.S. at 530, 104 S.Ct. 3194 (discussing convicted felons' diminished expectation of privacy). Further, the Supreme Court has held that even probationers lose their right to privacy in the search of their homes pursuant to an established law enforcement program. *See Griffin v. Wisconsin*, 483 U.S. 868, 880, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

"Gaines argues, however, that limitations on convicted persons' privacy rights are only permissible when maintaining order and security in a penal institution, and such privacy rights may not be diminished for the purpose set forth in the genetic marker testing statute—assisting the State in solving future crimes. A similar argument was rejected by the Ninth Circuit in *Rise*, where the court held that even when there is no legitimate penal interest:

> '[T]he State may interfere with an individual's Fourth Amendment interest with less than probable cause and without a warrant if the intrusion is only minimal and is justified by law enforcement purposes.'

*Rise*, 59 F.3d at 1559 (citing *Michigan State Police Dep't v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)). In sum, the overwhelming weight of authority supports the position that a convict has a diminished expectation of privacy in his identity, despite the fact that the State's interest does not concern administration of penal or detention facilities.

"Another factor balanced against the government's interest is the intrusive nature of the search. Courts considering Fourth Amendment challenges have determined that blood draws from convicted persons to gather genetic information for identification involve only a minimal intrusion. *See, e.g., Rise*, 59 F.3d at 1560;

*Jones*, 962 F.2d at 307. Most of these courts have relied on United States Supreme Court precedent, repeatedly concluding that a blood draw is not an 'unduly extensive imposition,' *see Winston v. Lee*, 470 U.S. 753, 762, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), and that it 'would not be considered offensive by even the most delicate,' *see Breithaupt v. Abram*, 352 U.S. 432, 436, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). *See also Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 625, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (blood tests do not 'infringe significant privacy interests'); *Schmerber v. California*, 384 U.S. 757, 771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (noting that drawing blood is 'commonplace').

"Gaines further argues that there are greater protected privacy interests in an individual's bodily fluids, and therefore a warrant and probable cause are always required before a blood draw absent exigent circumstances. Other courts have rejected similar arguments. In *Rise*, the court noted that the purpose of the warrant and probable cause requirement—to protect citizens from arbitrary acts of government by having a neutral magistrate evaluate whether the government's intrusion was warranted—was satisfied under Oregon's genetic marker statute because the statutory criteria were standardized, requiring conviction of a predicate offense before testing. *Rise*, 59 F.3d at 1561-62. Thus, there were 'virtually no facts for a neutral magistrate to evaluate.' [Citation omitted.]

"Similarly, the Nevada statutory criteria are standardized; certainly the statute objectively enumerates certain felonies for which DNA testing is prescribed. Thus, there would be no criteria for a magistrate to evaluate. We concur with the overwhelming weight of authority that the blood draw is a minimally intrusive search for which probable cause and a warrant are not always necessary.

"Courts have uniformly held that the government interest outweighs a convict's diminished right for privacy in his genetic markers because such information provides law enforcement with a dramatic new tool that can be used to accurately identify a criminal suspect attempting to conceal his identity. *See Jones v. Murray*, 962 F.2d 302, 308 (4th Cir.1992) ([also observing] that a DNA test can exculpate an accused as much as it can implicate him); *Landry v. Attorney General*, 429 Mass. 336, 709 N.E.2d 1085, 1090 (1999). Moreover, because of the high rate of recidivism among sexual and violent offenders, and because investigations of violent and sexual crimes are more likely to yield evidence from which DNA can be derived, compilation of DNA samples from violent and sexual offenders furthers the legislative purpose of solving future crimes. *See Jones*, 962 F.2d at 308; *Cooper v. Gammon*, 943 S.W.2d 699, 704 (Mo.Ct.App.1997).

"Gaines, however, argues that the State's interest in testing his DNA is weak because he was not a violent felon. We conclude that this argument lacks merit. First, Gaines pleaded guilty to two counts of burglary, a felony enumerated in the statute for which genetic marker testing is required. Second, we note that burglary has been an included offense in some states' genetic marker testing statutes because of its high recidivism rate. *See Jones*, 962 F.2d at 314." 116 Nev. at 367-71.

In summary, we need not consider the special needs doctrine in deciding the constitutionality of K.S.A. 2001 Supp. 21-2511. Under the balancing test considered and applied in *Schlicher, Boiling, Jones, Rise,* and *Gaines,* we hold K.S.A. 2001 Supp. 21-2511 is constitutional, as the minimally intrusive nature of providing blood and saliva samples is significantly outweighed by the State's interest in establishing and maintaining a statewide automated DNA database to search, match, and store DNA records.

Affirmed.

ABBOTT, J., not participating.

DAVID S. KNUDSON, J., assigned.