# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KENNETH A. FRIEDMAN,
      *Plaintiff-Appellant,*

v.

DOLPHUS BOUCHER; ELISSA LUZAICH,
      *Defendants-Appellees.*

No. 05-15675

D.C. No.
CV-04-00286-JCM

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
October 19, 2007—San Francisco, California

Filed June 23, 2009
Amended September 8, 2009

Before: Jane R. Roth,* Sidney R. Thomas, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Thomas;
Dissent by Judge Callahan

---

*The Honorable Jane R. Roth, Senior United States Circuit Judge for
the Third Circuit, sitting by designation.

12527

## COUNSEL

Tyler A. Baker, Saundra Riley, Kimberly I. Culp, and Julie A. Nokleberg; Fenwick & West LLP; Mountain View, California; for the appellant.

Robert J. Gower; Deputy District Attorney; Las Vegas, Nevada; for the appellees.

## ORDER

The opinion filed on June 23, 2009, is hereby amended by (1) deleting the first full paragraph found in the slip opinion at page 7613 (lines 7 through 24); (2) inserting "*v. Los Angeles Police Dep't*, 901 F.2d 702 (9th Cir. 1990) (impliedly overruled on other grounds by *Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam))" in the slip opinion on page 7613 after the word "*Kennedy*" on line 27, (3) deleting the material "901 F.2d" on page 7613 on line 29, and inserting "*Id.*" in lieu thereof; and (4) deleting "*Ward*, 791 F.2d at 1333; *Giles*, 746 F.2d at 615" on page 7617, line 22.

With the amendment, Judges Thomas and Roth have voted to deny the petition for panel rehearing. Judge Thomas has voted to deny the petition for rehearing en banc and Judge

Roth so recommends. Judge Callahan has voted to grant the petition for panel rehearing and petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on the petition for rehearing en banc. Fed. R. App. P. 35(b).

The petition for rehearing and the petition for rehearing en banc are rejected.

No further petitions for rehearing will be entertained.

---

## OPINION

THOMAS, Circuit Judge:

Las Vegas Metropolitan Police Detective Dolphus Boucher, with the approval of Clark County Deputy District Attorney Elissa Luzaich, forcefully extracted a DNA sample from Kenneth Friedman. The officer did not have a warrant or a court order authorizing the taking of the sample, nor was Friedman under any suspicion of a crime for which a DNA sample might be justified. The extraction occurred simply because the deputy district attorney wanted to put Friedman's DNA sample in a cold case data bank. Friedman alleges that the forcible extraction occurred after he was shackled and chained to a metal bar.

Friedman brought suit against Boucher and Luzaich ("Defendants") under 42 U.S.C. § 1983 on the ground that they violated his Fourth Amendment rights by taking the sample. The district court held that Boucher and Luzaich are entitled to qualified immunity and granted Defendants' motion to dismiss. Because the forcible taking of the DNA sample under these circumstances violated Friedman's clearly established Fourth Amendment rights, we reverse.

I

In 1980, Kenneth Friedman pled guilty to sexual intercourse without consent in the District Court of the Fourth Judicial District of the State of Montana. In 2001 Friedman completed his sentence and was released from Montana's supervision. After his release he was not a parolee, probationer, or otherwise under the supervision of the State of Montana.[1] He then moved to Las Vegas, Nevada.

In March 2003, Detective Boucher asked Friedman to provide a DNA sample. Friedman was at the time incarcerated in Clark County Jail as a pre-trial detainee pending the prosecution of unrelated charges. Boucher had no warrant, no court order, no individualized suspicion, had not articulated an offense for which a DNA sample was required or justified, and admitted as much to Friedman. He simply wanted the sample as an aid to solve cold cases.

Friedman declined to volunteer the DNA sample and asked to speak with his attorney. Boucher refused to allow Friedman to contact his attorney and told him that Deputy District Attorney Luzaich had authorized Boucher to obtain a DNA sample from Friedman, by force if necessary. Another detective told Friedman, "we can force you, we're authorized and you can get hurt pretty bad." Boucher and the other detective also threatened to call in other officers to beat him. Friedman alleges that, during the course of these interactions, he was sitting on a bench in chains and shackles and chained to a metal bar on the bench.

---

[1]Because the district court granted summary judgment in favor of the Defendants, the facts here are stated in the light most favorable to Friedman, the nonmoving party. *See Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). We recognize that the Defendants contest Friedman's factual allegations, and our recitation of facts taken in the light most favorable to Friedman does not constitute any opinion or conclusion as to how the factual disputes ultimately may be resolved in the district court.

After Friedman repeatedly refused to voluntarily provide a DNA sample, Boucher forced Friedman's jaw open and forcefully took a buccal swab[2] from the inside of Friedman's mouth. This search was not related to the Nevada charges then-pending against Friedman. Indeed, Luzaich later represented to a Nevada Justice Court that she had ordered the search to use Friedman's DNA in the investigation of cold cases. Friedman was not a suspect in any of the cases. In fact, not only was Friedman not an active suspect in any cold case, the record does not suggest that Friedman's DNA was ever actually used in the resolution of any cold case.

Friedman filed suit in federal district court, in the District of Nevada, on March 10, 2004, alleging that Boucher and Luzaich's forcible taking of his DNA violated his Fourth Amendment right to be free from unreasonable searches. Boucher and Luzaich moved to dismiss the complaint, arguing that they were entitled to qualified immunity.

The district court initially denied Defendants' Motion to Dismiss. Shortly thereafter, we decided *United States v. Kincade*, 379 F.3d 813 (9th Cir. 2004) (en banc), which upheld the constitutionality of compulsory DNA profiling of certain conditionally-released federal offenders under the DNA Analysis Backlog Elimination Act of 2000., Pub. L. No. 106-546, 114 Stat. 2726 (2000). The district court then ordered Friedman to show cause why Boucher and Luzaich were not entitled to qualified immunity, in light of *Kincade*. On March 25, 2005, relying on *Kincade* and the exhibits attached to Defendants' Motion to Dismiss, the district court granted summary judgment[3] in favor of Defendants on the ground that Defen-

---

[2]A buccal swab is a swab taken from the mouth area to collect cheek cells.

[3]The motion granted by the district court was a motion to dismiss. However, in granting that motion, the court relied on documents attached to the motion which were outside the allegations in Friedman's complaint. When a district court relies on information outside the complaint in a motion to dismiss, the motion is automatically converted to a motion for summary judgment. Fed. R. Civ. P. 12(b)(6); *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

dants were entitled to qualified immunity. This appeal followed.

## II

We review de novo a district court's decision to grant summary judgment on the ground of qualified immunity. *Motley v. Parks*, 383 F.3d 1059, 1062 (9th Cir. 2004). In reviewing a district court's grant of summary judgment we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen*, 363 F.3d at 922.

[1] To determine whether a government employee is entitled to qualified immunity, we use a two-part test. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We must determine whether, viewed in the light most favorable to the plaintiff, the government employee violated the plaintiff's constitutional rights. *Id.* We must also determine whether the rights were clearly established at the time of the violation. *Id.*; *Pearson* v. *Callahan*, 129 S. Ct. 808, 818-22 (2009).

## III

[2] We turn first to the question of whether the warrantless, suspicionless, forcible taking of Friedman's DNA violated his constitutional rights. There is no question that the buccal swab constituted a search under the Fourth Amendment. The Supreme Court has held that invasions of the body are searches and, thus, are entitled to the protections of the Fourth Amendment. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616-17 (1989) (breathalyzer and urine sample); *Cupp v. Murphy*, 412 U.S. 291, 295 (1973) (finger nail scrapings); *Schmerber v. California*, 384 U.S. 757, 767-71 (1966) (blood). We have held, similarly, that the Fourth Amendment protects against "all searches that invade the interior of the body—whether by a needle that punctures the skin or a visual

intrusion into a body cavity." *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1449 (9th Cir. 1991); *see also Padgett v. Donald*, 401 F.3d 1273, 1277 (11th Cir. 2005) (swabbing the inside of mouth for saliva is a search); *Schlicher v. Peters*, 103 F.3d 940, 942-43 (10th Cir. 1996) (collection of saliva is a search). As we put it in *United States v. Kriesel*: "The compulsory extraction of blood for DNA profiling unquestionably implicates the right to personal security embodied in the Fourth Amendment, and thus constitutes a 'search' within the meaning of the Constitution." 508 F.3d 941, 946 (9th Cir. 2007) (quoting *Kincade*, 379 F.3d at 821).

**[3]** There is also no dispute that the search was conducted without a warrant. "A warrantless search is unconstitutional unless the government demonstrates that it 'fall[s] within certain established and well-defined exceptions to the warrant clause.' " *United States v. Brown*, 563 F.3d 410, 414-15 (9th Cir. 2009) (quoting *United States v. Murphy*, 516 F.3d 1117, 1120 (9th Cir. 2008) (quoting *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988))).

Thus, unless the government can establish that the warrantless, suspicionless, forcible taking of a buccal swap satisfies one of the exceptions to the warrant requirement, we must hold the search to be unconstitutional.

Defendants offer three arguments in urging that an exception to the warrant requirement applies in this case: (1) the special needs exception to the warrant requirement; (2) a Montana statute authorized the search; and (3) the search was "reasonable."

A

**[4]** The government was not entitled to conduct the warrantless, suspicionless search based on the "special needs" exception. The "special needs" exception is "an exception to the general rule that a search must be based on individualized

suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 54 (2000). Under this exception, suspicionless searches may be upheld if they are "conducted for important *non-law enforcement purposes* in contexts where adherence to the warrant-and-probable cause requirement would be impracticable." *Kincade*, 379 F.3d at 823 (emphasis added); *see also United States v. Heckencamp*, 482 F.3d 1142, 1147 (9th Cir. 2007) (applying a special needs exception when a university computer system was under imminent threat).

**[5]** The "special needs" exception is limited to "important non-law enforcement purposes." *Kincade*, 379 F.3d at 823. The only government interest asserted by Nevada in taking Friedman's DNA was to help solve "cold cases." Solving crimes is clearly a normal law enforcement function. Because the "special needs" exception applies only to non-law enforcement purposes, and the State's interest here is the use of data for purely law enforcement purposes, the "special needs" exception is inapplicable.

## B

**[6]** Defendants' second argument is that they were permitted to take the buccal swab by Montana Code Annotated Section 44-6-103 (2003) ("the Montana Statute"). The Montana Statute was passed in 1995 and requires persons convicted of certain enumerated offenses to provide a biological sample to the Montana Department of Justice for DNA analysis. Mont. Code Ann. § 44-6-103. The crime to which Friedman pled guilty in 1980 was one of the predicate offenses.

As a preliminary matter, we note that adherence to a state statute does not guarantee compliance with the Fourth Amendment. *See Virginia v. Moore*, 128 S. Ct. 1598, 1602 (2008). We need not consider whether the Montana statute itself violates the Fourth Amendment, however. Defendants' argument that the buccal swab was properly taken in accor-

dance with the Statute fails because the Montana statute does not apply to Friedman.

### 1

[7] The Montana Statute does not apply extraterritorially. At the risk of stating the obvious, the Montana Statute is a statute passed by the Montana State Legislature which operates as law in the State of Montana. Defendants argue that Nevada state officials can take action which would otherwise be prohibited in Nevada[4] against a Nevada citizen in the State of Nevada simply by relying on a Montana statute. This argument was rejected almost a century ago by the United States Supreme Court, when it considered "the power of the State of Missouri to extend the operation of its statutes beyond its borders into the jurisdiction of other States, so as in such other States to destroy or impair the right of persons not citizens of Missouri to contract." *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 160 (1914). Holding that a state does not possess such power, the Court explained:

> Such question, we think, admits of but one answer since it would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State and in the State of New York and there destroy freedom of contract without throwing down the constitutional barriers by which all the States are restricted . . . . *This is so obviously the necessary result of the Constitution that it has rarely been called in question* and hence authorities directly dealing with it do not abound.

*Id.* at 161 (emphasis added). *See also BMW of North America, Inc. v. Gore*, 517 U.S. 559, 572 (citing *N.Y. Life* in support of the proposition that "[n]o State can legislate except with reference to its own jurisdiction.").

---

[4]There is no Nevada statute comparable to the Montana Statute.

More recently, the Supreme Court rejected the State of Nevada's attempt to obtain immunity from suit in California by reliance on immunities granted under Nevada law. *See Nevada v. Hall*, 440 U.S. 410, 426 (1979) ("The people of Nevada have consented to a system in which their State is subject only to limited liability in tort. But the people of California, who have had no voice in Nevada's decision have adopted a different system. Each of these decisions is equally entitled to our respect.").

**[8]** Defendants were Nevada officials searching a Nevada citizen in the state of Nevada for Nevada law enforcement purposes. They are not entitled to justify their search with a Montana statute.

### 2

**[9]** Even if the Montana Statute could constitutionally apply extraterritorially, the plain language of the Montana Statute makes the statute inapplicable to the seizure of Friedman's DNA by Nevada officials for a number of reasons.

First, the Montana Statute does not apply to persons like Friedman who are not under state supervision. While the statute requires a DNA sample from all "person[s] convicted of a felony offense," Mont. Code. Ann. § 44-6-103(1), the statute provides only one consequence if such a person refuses to provide a sample: "The knowing refusal or failure to provide a biological sample under this part is grounds for revocation of a suspended or deferred imposition of sentence." § 44-6-103(5). At the time that Defendants demanded the DNA sample, Friedman was not subject to either a suspended or deferred imposition of sentence. Given that his criminal judgment had been satisfied, Montana had no further supervisory authority over Friedman. Friedman was not subject to the requirements of the statute. *See State v. Johnson*, 108 P.3d 485, 487 (Mont. 2005) (noting that the DNA test requirements applied to prisoners, and distinguishing the privacy interests

of private citizens); *see also United States v. Sczubelek*, 402 F.3d 175, 178 (3rd Cir. 2005) (noting in context of federal law that "[i]f the government no longer has the authority to collect a DNA sample from [the defendant], there is no need to determine the constitutionality of taking that sample.").[5]

Second, the Montana statute only authorizes the collection of DNA for placement in the Montana Department of Justice DNA identification index. Mont. Code Ann. § 44-6-1-102. When a sample is collected, the sample must be transmitted to the Montana Department of Justice within seven days. Mont. Code Ann. § 44-6-103(2); Mont. Admin. R. 23.4.503. Once placed in the Montana index, the DNA records may only be released on written request by a statutorily qualified party, on terms and conditions established by the Montana Department of Justice. Mont. Code Ann. § 44-6-106. DNA testing records maintained in the index are considered confidential criminal justice information, *see* Mont. Code Ann. § 44-6-108, subject to the strict restrictions on disclosure contained in the Montana Criminal Justice Information Act of 1979, Mont. Code Ann. § 44-5-303. Nevada officials did not purport to be taking the sample for transmittal to Montana; rather, they wanted the DNA sample to check against cold cases in Nevada. There is nothing in the record to indicate that Nevada transmitted the sample to Montana, or that it subsequently sought written permission from Montana for use of the sample, as required by the Montana Statute.

---

[5]Nor was Friedman subject under Montana law to further court jurisdiction after the formal term had expired, as was the case under federal law in *Sczubelek*, 402 F.3d at 179; *see also United States v. Neville*, 985 F.2d 992, 995-96 (9th Cir. 1993) (holding under federal statute that even if the term of supervised release had expired, a district court retained jurisdiction to hold a hearing and revoke the defendant's supervised release provided that some formal revocation proceeding had begun within the term of supervised release—whether it be a warrant, summons, an order to show cause, or a petition charging a violation of supervised release.)

Third, the Montana Statute does not authorize *Defendants* to obtain a DNA sample. The statute explicitly provides: "If the person is not incarcerated in a facility administered by the department of corrections, the sample must be provided to a person or entity *designated by the county sheriff*." § 44-6-103(2) (emphasis added). There is nothing in the record to indicate that either Boucher or Luzaich were ever designated by a Montana county sheriff to take Friedman's DNA sample.[6]

Fourth, no part of the Montana Statute purports to authorize any entity or person to take a sample from any subject by force, as Defendants did in this case. The Montana Statute requires persons subject to its provisions to "provide" a biological sample. As discussed above, a "knowing refusal or failure to provide" is "grounds for revocation of a suspended or deferred imposition of sentence." Mont. Code Ann. § 44-6-103(5). There are no other penalties prescribed for failure to willingly provide a sample, and the Montana Statute does not authorize any law enforcement official, either within or outside Montana, to extract a DNA sample by force.

[10] Finally, the Montana Statute must be construed in light

---

[6]After moving to Las Vegas, Friedman received a letter ("the Montana Letter") from Bill Slaughter, of the Montana Department of Corrections. The letter directed Friedman to provide a DNA sample to Sergeant Tom Keller of the Clark County Sheriff's Department in Nevada. The letter cited the Montana Statute. Defendants argue that this letter gave them authority to take the DNA sample. However, the letter does not mention Boucher, Luzaich or the Las Vegas Police Department and was not issued with the authority of a Montana county sheriff, as would be required by the statute. Further, the letter was addressed only to Friedman and there is no evidence on the record that Boucher or Luzaich were even aware of the letter at the time of the search. Friedman declined to voluntarily provide a DNA sample, as requested by the letter. Friedman also avers that he and his attorney consulted with the Montana Attorney General's Office and received oral confirmation that Montana would not and could not enforce compliance with the Montana Statute while Friedman resided as a private citizen in Nevada. In short, the letter cannot be construed to invoke the designation provision of the statute.

of the Constitution of Montana. The Montana Constitution contains one of the strongest state constitutional protections of privacy in the Nation. *See* Mont. Const. art. II, § 10 ("The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."). "Montana's Constitution affords citizens broader protection at the hands of the government in search and seizure cases than does the Federal Constitution." *State v. Siegal*, 934 P.2d 176, 183 (Mont. 1997); *see also* Hon. James C. Nelson, *The Right to Privacy*, 69 Mont. L. Rev. 257, 259 (2007) ("This [privacy] right in Montana guarantees far greater protection from unreasonable searches and seizures than does the Fourth Amendment to the federal Constitution.").

**[11]** In *State v. Johnson*, the Montana Supreme Court was not only careful to exclude private citizens from its holding that the Montana Statute authorized the collection of DNA samples, but specifically reserved the question of whether the Montana Statute could withstand scrutiny under the Constitution of Montana. 108 P.3d at 487. Thus, whether the Montana Statute itself would withstand state constitutional scrutiny by the Montana Supreme Court is an open question. In construing statutes, "we are governed by the canon of constitutional avoidance, which requires a statute to be construed so as to avoid serious doubts as to the constitutionality of an alternate construction." *Nadarajah v. Gonzales,* 443 F.3d 1069, 1076 (9th Cir. 2006). Given the constitutional restrictions applicable to this statute, we are bound to construe it narrowly. A narrow construction of the Montana Statute cannot possibly support the extraterritorial, forcible extraction of DNA from a private citizen of another State, who is not subject to Montana supervision.

3

For all these reasons, we must reject the government's reliance on the Montana statute as an exception to the warrant requirement.

C

Defendants' final argument is that the search was "reasonable," contending that pre-trial detainees have limited privacy rights that must yield to the desires of law enforcement to collect DNA samples for use in law enforcement databases. Thus, the reasoning goes, the government has the inherent right, without a search warrant and without suspicion of criminal activity, to extract DNA forcibly from pre-trial detainees. However, neither the Supreme Court nor this Court has ever ruled that law enforcement officers may conduct suspicionless searches on pretrial detainees for reasons other than prison security. Indeed, as the Supreme Court stated emphatically in *Schmerber*: "The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained." 384 U.S. at 769-70. In contrast to the government's position in this case, which would endorse routine, forcible DNA extraction, the Court concluded: "The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." *Id.* at 770.

**[12]** We have also carefully confined administrative searches at detention facilities to those reasonably related to security concerns. In *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702 (9th Cir. 1990) (impliedly overruled on other grounds by *Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam)), for example, we held unconstitutional a blanket strip search policy which subjected all felony arrestees to a visual body cavity search. *Id.* at 714. We noted that "the enacted policy, if it is to be constitutional, must be 'reasonably related' to the penal institution's interest in maintaining security." *Id.* at 713. Even in *Bell v. Wolfish*, 441 U.S. 520 (1979), a case upon which the dissent relies, the Supreme Court repeated its observation that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country," *id.* at 544 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974)), but

justified the search for contraband at issue on the basis of the "institution's interest in maintaining jail security," *id.* at 540. Neither the Supreme Court nor our court has permitted general suspicionless, warrantless searches of pre-trial detainees for grounds other than institutional security or other legitimate penological interests. Thus, there is no support for the government's contention that Friedman's status as a pre-trial detainee justifies forcible extraction of his DNA.

Defendants cite a number of appellate cases that uphold the constitutionality of state DNA bank laws. Not one of those cases involved a search of a pretrial detainee—as opposed to a convicted prisoner—or a state law that mandated searches of pretrial detainees.[7] None of these cases uphold a search similar to the suspicionless one of a pretrial detainee in this case.

In *Kincade* and *Kriesel*, we upheld against Fourth Amendment challenges a federal DNA profiling law and amendments extending that law. However, both of those cases concerned extracting DNA from convicted felons still under state supervision. *See Kriesel*, 508 F.3d at 944 (Kriesel was on probation); *Kincade*, 379 F.3d at 821 (Kincade was on parole). The law at issue required DNA samples "to be collected from individuals in custody and those on probation, parole, or supervised release after being convicted of qualify-

---

[7] *See Rise v. Oregon*, 59 F.3d 1556, 1558 (9th Cir. 1995) (upholding an Oregon law requiring persons *convicted* of murder, a sexual offense, or conspiracy or attempt to commit a sexual offense to submit a blood sample for use in a DNA bank); *Roe v. Marcotte*, 193 F.3d 72, 74 (2d Cir. 1999) (upholding a Connecticut state law requiring *convicted* sexual offenders to submit blood samples to a DNA bank); *Schlicher v. Peters*, 103 F.3d 940, 941 (10th Cir. 1996) (requiring certain *convicted felons* to submit blood and saliva specimens for a DNA bank); *Boling v. Romer*, 101 F.3d 1336, 1338 (10th Cir. 1996) (upholding a Colorado law requiring inmates convicted of a sexual assault offense to provide the state with DNA samples); *Jones v. Murray*, 962 F.2d 302 (4th Cir. 1992) (upholding a similar Virginia law that applies to *convicted* felons).

ing Federal offenses." *Kriesel*, 508 F.3d at 943 (internal quotation marks omitted). The Supreme Court articulated the rationale for sustaining these types of searches in *Samson v. California*, in which the Court upheld a search on the basis of the plaintiff 's status as a parolee, citing the requirement of "intense supervision" of such persons and the problems of "re-integration" of parolees into society. 547 U.S. 843, 854 (2006).

However, the considerations underlying *Sampson*, *Kincade*, and *Kriesel* are absent here. Friedman was not on parole. He had completed his term of supervised release successfully and was no longer the supervision of any authority. The Nevada authorities extracted the DNA from Friedman not because they suspected he had committed a crime, nor to aid in his reintegration into society, nor as a matter of his continuing supervision. Their purpose was simply to gather human tissue for a law enforcement databank, an objective that does not cleanse an otherwise unconstitutional search.

D

**[13]** The warrantless, suspicionless, forcible extraction of a DNA sample from a private citizen violates the Fourth Amendment. The actions of the officers were not justified under the "special needs" exception, reliance on an extraterritorial statute, or on general Fourth Amendment principles. The search and seizure of Friedman's DNA violated the Constitution.

IV

**[14]** Having determined that the search violated the Constitution, we must next ask whether the constitutional right violated was clearly established at the time of the search. *See Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." *Id.* at 202. In other words, the inquiry is whether a reasonable person could have believed his actions lawful at the time they were undertaken. *Anderson v. Creighton*, 483 U.S. 635, 646 (1987).

The rule that a search violates the Fourth Amendment if it is not supported by either probable cause and a warrant or a recognized exception to the warrant requirement has long been clearly established. *See, e.g.*, *Schmerber*, 384 U.S. at 770-71. Thus, the real question in determining whether Defendants are entitled to qualified immunity is whether it was clearly established, at the time of the search, that such a search does not fall under any recognized exception. As discussed above, the only recognized exceptions that the search could possibly fall under are the special needs exception, the Montana Statute, or its "reasonableness."[8]

**[15]** No reasonable detective or prosecutor could have thought that the search was justified under the "special needs" exception. Under the "special needs" exception, suspicionless searches are upheld if they are "conducted for important *non-law enforcement purposes* in contexts where adherence to the warrant-and-probable cause requirement would be impracticable." *Kincade*, 379 F.3d at 823 (emphasis added). There is no question that the DNA sample was taken for a law enforcement purpose—Luzaich admitted in court that she wanted the sample for use in solving "cold cases"—nor is there any question that there would have been ample opportunity to obtain a warrant. Friedman was in custody in Clark County Jail when the sample was taken. There was no exigency or other reason that Defendants could not have sought a warrant before taking the sample, other than the fact that they had no

---

[8]Additionally, we note that, because the search took place in 2003, neither *Samson*, *Kincade*, nor *Kriesler* had yet been decided. Therefore Defendants would have had no basis to conclude that their search was reasonable absent the special needs exception or adherence to the Montana Statute.

probable cause on which to base their warrant request. The lack of probable cause is not itself a justification for conducting a search without a warrant and probable cause.

**[16]** No reasonable police detective or prosecutor could have believed that the Montana Statute authorized a forcible taking of a DNA sample from a Nevada citizen for Nevada law enforcement purposes. The reliance on an extraterritorial statute was not reasonable. As the Supreme Court observed: "This is so obviously the necessary result of the Constitution that it has rarely been called in question." *N.Y. Life*, 234 U.S. at 161 (holding that a Missouri statute cannot operate in New York). Nor was such a reliance reasonable based on a plain reading of the Montana Statute, as we have discussed in detail.

**[17]** Similarly, controlling precedent at the time of the search disallowed warrantless, suspicionless, non-security related searches of pre-trial detainees. Our case law precluded the interpretation that the government could forcibly extract DNA from all pre-trial detainees as a matter of routine, unrelated to facility security considerations. *Kennedy*, 901 F.2d at 714. Our circuit precedent was consistent with the direction of the Supreme Court that searches invading the human body could not be justified "on the mere chance that desired evidence might be obtained." *Schmerber*, 384 U.S. at 769-70.

In short, no reasonable detective or prosecutor could have thought that they could forcibly take a DNA sample from Friedman without violating his Fourth Amendment rights. Because Friedman's rights were clearly established at the time that Defendants took the sample, the Defendants are not entitled to qualified immunity.

Boucher additionally argues that he is entitled to qualified immunity because he was acting on Luzaich's orders. However, when a police officer argues he is entitled to qualified immunity because he relied on the advice of a prosecutor, it

does not render the officer's conduct per se reasonable, as Boucher suggests. *See Stevens v. Rose*, 298 F.3d 880, 884 (9th Cir. 2002). Rather, it may be evidence of good faith. *Id.* However, if the facts show that the right the officer violated "was clearly established and would be known to a reasonable officer in the circumstances," then the officer is not entitled to qualified immunity, regardless of the prosecutor's advice. *Id.* As we noted in *Arnsberg v. United States*, 757 F.2d 971, 981 (9th Cir. 1985), where a police officer is acquainted with the controlling law and does not need the advice of counsel to assess the legality of his actions, statements made by a prosecutor will not shield the officer from liability if he then violates the law.

Viewing the facts in the light most favorable to Friedman, as we must at this stage, we conclude that a reasonable officer in Boucher's circumstances would have known that forcibly taking a DNA sample from a pre-trial detainee without a search warrant or other court authority would violate the detainee's clearly established Fourth Amendment rights.[9] When a right is clearly established and a reasonable officer should be familiar with that clearly established law, then the officer cannot escape liability purely by reliance on a prosecutor's equally unconstitutional actions.

V

**[18]** Shackling a detainee, chaining him to a bench, and forcibly opening his jaw to extract a DNA sample without a warrant, court order, reasonable suspicion, or concern about

---

[9]We recognize, however, that on close questions, reliance on the advice of counsel may be reasonable and constitute evidence of good faith relevant to the determination of qualified immunity. We further recognize that our conclusions on qualified immunity in this context are solely based on the facts as alleged and viewed in the light most favorable to the plaintiff. Our reversal of the district court's grant of qualified immunity does not preclude Boucher from filing a summary judgment motion based on qualified immunity once the facts are fully developed through discovery.

facility security is a violation of the detainee's clearly established rights under the Fourth Amendment. Because the forcible taking of the DNA sample violated Friedman's clearly established constitutional rights, neither Boucher nor Luzaich is entitled to qualified immunity. We need not, and do not, reach any other issue urged by the parties on appeal.

**REVERSED AND REMANDED.**

---

CALLAHAN, Circuit Judge, dissenting:

I respectfully dissent from the reversal of the district court's grant of qualified immunity. The majority's determination that Kenneth Friedman ("Friedman") had a clearly established right of privacy under the Fourth Amendment to prevent state authorities from using a buccal swab to take a DNA sample, fails to appreciate three lines of precedents that undermine its conclusion. First, both the Supreme Court and this court have held that incarcerated individuals have little, if any, expectation of privacy under the Fourth Amendment. Second, we have also held that a person legitimately in state custody has almost no right against disclosing his or her identity. Third, we have held that governments have compelling interests in establishing the identity of incarcerated repeat sex offenders. Here, Friedman, a convicted sex offender, was a pre-trial detainee facing charges of indecent exposure and open and gross lewd conduct when the state officials took a buccal swap from the inside of his mouth. In the parlance of the majority's opinion, I would hold that this minimally invasive search was "reasonable."

Furthermore, even if these lines of precedent did not compel the conclusion that the search was reasonable, they raise substantial questions as to Friedman's right of privacy in this situation. Pursuant to *Saucier v. Katz*, 533 U.S. 194, 201 (2001), an officer is entitled to qualified immunity when the

violation was not clearly established. Here, the very fact that the district court and I disagree with the majority on whether the search was reasonable, shows that Friedman's right was not clearly established, and accordingly, the defendants are entitled to qualified immunity.[1]

## I.

Friedman is a violent sex offender who has spent a significant portion of his life in prison having been convicted of several rapes in Ohio and Montana. Friedman's journey through the criminal justice system began in Ohio where he was convicted in 1975 of felony rape and felony aggravated burglary and sentenced to a term of four to twenty-five years. After serving several years in prison, he moved to Montana and after being arrested and charged in 1980 with a variety of felony offenses pled guilty to two counts of felony sexual intercourse without consent, one count of felony aggravated assault, and three counts of misdemeanor theft. Although Friedman was originally sentenced to serve forty years in prison, twenty of those years were later suspended, and he was designated a "dangerous offender" for purposes of parole eligibility based on the court's finding that he presented a danger to the public.

After completing his Montana prison sentence, Friedman moved to Las Vegas, Nevada in 2001. The State of Montana's Department of Corrections sent a letter to Friedman's Nevada residence notifying him that as a designated sex offender he was required to submit a DNA sample pursuant to Montana Code Annotated section 44-6-103(1), and that he should contact a sergeant in the Clark County Sheriff's Department in Nevada to schedule an appointment to provide a DNA sample. Friedman never complied.

---

[1] I do not take issue with the majority's conclusion that Nevada authorities could not rely on Montana Code Annotated section 44-6-103 as statutory authority to collect a DNA sample from Friedman.

In August 2002, Las Vegas police officers detained and questioned Friedman for stalking an individual at a health club and making a threatening telephone call. They requested that Friedman provide a DNA sample, which he refused. Friedman asserts that over the course of the next five months he was searched or arrested at least a half dozen times by police officers. On February 10, 2003, Friedman was arrested and charged with indecent exposure and open and gross lewd conduct. He was then incarcerated in the Clark County Jail. Friedman claims that upon his arrest, Las Vegas Metropolitan Police Department Detective Dolphus Boucher demanded a DNA sample from him. Friedman refused and no action was taken. In March 2003, while still a prisoner in the Clark County Jail awaiting trial on his pending charges, Friedman was taken to Detective Boucher who once again demanded a DNA sample. After Friedman refused, Detective Boucher allegedly told him that he was authorized by Clark County Deputy District Attorney Elissa Luzaich to take the DNA sample by force. Acting under this authorization, Detective Boucher forcibly took a buccal swab of DNA from the inside of Friedman's mouth without his consent.

## II.

The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The Fourth Amendment is not triggered unless the state conducts a search or seizure in an area "in which there is a 'constitutionally protected reasonable expectation of privacy.' " *United States v. Van Poyck*, 77 F.3d 285, 290 (9th Cir. 1996) (quoting *New York v. Class*, 475 U.S. 106, 112 (1986) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring))). The modern test for determining

whether there is a "constitutionally protected reasonable expectation of privacy" is whether the search or seizure by the government violates a subjective expectation of privacy that society objectively recognizes as reasonable.[2] *Id.* We have previously recognized that the "[n]on-consensual extraction of blood implicates Fourth Amendment privacy rights." *Rise v. Oregon*, 59 F.3d 1556, 1558-59 (9th Cir. 1995) (citations omitted). The non-consensual use of a buccal swab, although significantly less intrusive than a blood sample, still implicates the Fourth Amendment.

The Fourth Amendment, however, does not proscribe all searches and seizures, but only those that are unreasonable. *Virginia v. Moore*, S. Ct. 1598, 1602 (2008). In order to assess whether a search is reasonable absent individualized suspicion, we apply the "general Fourth Amendment approach" and examine the totality of the circumstances in objective terms " 'by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *Samson v. California*, 547 U.S. 843, 848 (2006) (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001)); *see also Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("Reasonableness . . . is measured in objective terms by examining the totality of the circumstances.").

## A.   Expectation of Privacy

Fourth Amendment rights for inmates — whether they are convicted or pretrial detainees — fall on the lowest end of the

---

[2]For example, the Supreme Court has held that an individual does not have a reasonable expectation of privacy in attributes exposed to the public including one's voice, *United States v. Dionisio*, 410 U.S. 1, 14 (1973); handwriting, *United States v. Mara*, 410 U.S. 19, 21 (1973); financial records filed with a bank, *United States v. Miller*, 425 U.S. 435, 436-37 (1976); and trash left on the curbside, *California v. Greenwood*, 486 U.S. 35, 37 (1988).

expectation of privacy spectrum. Although we have previously recognized that prisoners do not leave all of their Fourth Amendment privacy rights at the jailhouse doors, *see Van Poyck*, 77 F.3d at 291 (prisoners' privacy rights are "severely curtailed") (citations omitted), once the doors close, most privacy rights are left on the jailhouse steps. The state's use of a buccal swab to collect a DNA sample implicates two separate privacy interests: (1) an interest in bodily integrity implicated by placing a swab in Friedman's mouth, and (2) a privacy interest in the identifying information contained in the DNA. *See United States v. Kriesel*, 508 F.3d 941, 947-48 (9th Cir. 2007); *United States v. Kincade*, 379 F.3d 813, 836-37 (9th Cir. 2004) (en banc) (plurality)*; Rise*, 59 F.3d at 1559-60. I examine each one separately.

### 1. *The privacy interest in bodily integrity*

Time and again, we have stated that the use of a blood test to take a DNA sample from an individual under state supervision is a minimal intrusion of one's bodily integrity under the Fourth Amendment. *See Kriesel*, 508 F.3d at 948; *Kincade*, 379 F.3d at 836-37*; Rise*, 59 F.3d at 1560. In *Kriesel*, where the federal government used a blood test to collect the DNA sample from a supervised releasee, we noted that the Supreme Court has held that the intrusion occasioned by a blood test "is not significant, since such 'tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.' " 508 F.3d at 948 (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 625 (1989)). Notably, in finding the intrusion in *Kriesel* to be minimal, we stated "the additional privacy implications of a blood test collecting DNA, as opposed to a cheek swab or other mechanism, do not significantly alter our analysis." *Id.* Moreover, in *Kincade*, we recognized that individuals "in custody have been lawfully subject to much more severe intrusions of their corporeal privacy than a sterile blood draw," like suspicion-

less body cavity searches. 379 F.3d at 837 (citing *Bell v. Wolf-ish*, 441 U.S. 520, 558-60 & n.39 (1979) (upholding suspicionless body cavity searches of pretrial detainees and convicted prisoners)); *see also Rise*, 59 F.3d at 1560 ("That the gathering of DNA information requires the drawing of blood rather than inking and rolling a person's fingertips does not elevate the intrusion upon the plaintiffs' Fourth Amendment interests to a level beyond minimal.").[3] The state's use of a buccal swab to collect DNA cells from the inside of a pretrial detainee's mouth is undeniably far less intrusive than drawing blood and a relatively minor intrusion upon Friedman's expectation of bodily privacy.

### 2. *The privacy interest in identifying information*

While Friedman may have a minimal expectation of privacy when it comes to his bodily integrity as a result of the use of a buccal swab, he has even less of an expectation when it comes to a privacy interest in the identifying information contained in the DNA. Of course, a law enforcement agent cannot generally approach law-abiding citizens on the street and forcibly take fingerprint evidence absent some type of individualized suspicion. *See Rise*, 59 F.3d at 1559. We have stated, however, that "in the fingerprinting context, there exists a constitutionally significant distinction between the gathering of fingerprints from free persons to determine their guilt of an unsolved criminal offense and the gathering of fingerprints for identification purposes from persons within the lawful custody of the state." *Id.* at 1560. Once an individual

---

[3]As Judge Easterbrook has observed, a DNA blood test is "no different from use of a fingerprint; only the method of obtaining the information differs, and for prisoners that is a distinction without importance." *Green v. Berge*, 354 F.3d 675, 680 (7th Cir. 2004) (Easterbrook, J., concurring); *see also Nicholas v. Goord*, 430 F.3d 652, 658 (2d Cir. 2005) ("In the prison context, where inmates are routinely subject to medical procedures, including blood draws, and where their expectation of bodily privacy, while intact, is diminished, the intrusiveness of a blood draw is even further minimized").

is lawfully arrested based upon probable cause, his identification becomes a matter of legitimate state interest, and he cannot claim privacy in it. *See Kincade*, 379 F.3d at 837; *see also Groceman v. U.S. Dep't of Justice*, 354 F.3d 411, 413-14 (5th Cir. 2004) ("Though, like fingerprinting, collection of a DNA sample for purposes of identification implicates the Fourth Amendment, persons incarcerated after conviction retain no constitutional privacy interest against their correct identification."); *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992) ("We have not been made aware of any case, however, establishing a per se Fourth Amendment requirement of probable cause, or even a lesser degree of individualized suspicion, when government officials conduct a limited search for the purpose of ascertaining and recording the identity of a person who is lawfully confined to prison.").

We have applied this same reasoning in the context of DNA identification.A "DNA profile . . . establishes only a record of the defendant's identity — otherwise personal information" in which somebody lawfully arrested can claim no right of privacy. *Kincade*, 379 F.3d at 837; *see also Rise*, 59 F.3d at 1559 ("The information derived from [a DNA] blood sample is substantially the same as that derived from fingerprinting — an identifying marker unique to the individual from whom the information is derived."). In fact, we have stated that "[t]hose who have suffered a lawful conviction lose an interest in their identity to a degree well-recognized as sufficient to entitle the government permanently to maintain a verifiable record of their identity."[4] *Kincade*, 379 F.3d at 837 n.32. Although Friedman had not been convicted of the offense for which he was being held when the DNA sample was collected, he was a repeat sex offender, which as noted in the next section provided the government with an additional interest in establishing his identity.

---

[4]It also bears mentioning that Nevada's DNA collection statute, Nev. Rev. Stat. § 176.0913(6), makes it illegal to make any unauthorized disclosure of biological specimens taken pursuant to the collection statute.

## B.   Legitimate Governmental Interests

Friedman's minimal expectation of privacy must be weighed against the state's compelling interests in collecting a DNA sample from an incarcerated sex offender. Similar to fingerprinting, we have recognized that the use of DNA as a means of identification of individuals within the state's custody is a significant governmental interest. *Id.* at 837; *Rise*, 59 F.3d at 1560. Other circuits agree. The Fourth Circuit has observed:

> It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features. Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate. The DNA, however, is claimed to be unique to each individual and cannot, within current scientific knowledge, be altered. The individuality of the DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime within samples of blood, skin, semen or hair follicles. The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.

*Jones*, 962 F.2d at 307; *see also United States v. Sczubelek*, 402 F.3d 175, 185-86 (3d Cir. 2005) (quoting and adopting language in *Jones*).

The fact that Friedman is a convicted sex offender provided Nevada with additional reasons for seeking a DNA sample. The state has a significant interest in monitoring sex offenders and solving crimes. "Sex offenders are a serious threat in this Nation." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 4 (2003) (quoting *McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality opinion)). "[T]he victims of sex assault are most often juveniles," and "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sexual assault." *Id.* (quoting *McKune*, 536 U.S. at 32-33). DNA profiling also has a deterrent effect that "fosters society's enormous interest in reducing recidivism." *Kincade*, 379 F.3d at 838-39. In addition, we have stated that the collection of DNA for use in a data bank "advances the overwhelming public interest in prosecuting crimes *accurately* — DNA evidence can exculpate an accused just as effectively as it can inculpate him." *Rise*, 59 F.3d at 1561. In addition to solving past crimes, "DNA profiling . . . helps bring closure to countless victims of crime who long have languished in the knowledge that perpetrators remain at large." *Kincade*, 379 F.3d at 839.

For these reasons, I would find that our case law leads to a conclusion that a lawfully incarcerated individual, particularly a repeat sex offender like Friedman, does not have a Fourth Amendment right to prevent state authorities from using a buccal swab to take a DNA sample. I do not agree with the majority's suggestion that gathering DNA for a "law enforcement databank" is not in itself sufficient to allow the minimally intrusive invasion of a buccal swap of a person legally in state custody. The majority also implies that there were no security concerns that supported the forcible taking of DNA from Friedman, a pre-trial detainee. The inherent import of these assertions, however, is the implication — which, as indicated, I think is correct under our case law — that the defendants could forcibly take a DNA sample from Friedman if he were a convicted prisoner or if there was a security concern. Friedman, however, was being held in the

county jail and it is self-evident that the jailers' concerns with security extend to all inmates, both those that have been convicted and those that are awaiting trial. Moreover, despite Deputy District Attorney Luzaich's subsequent assertion that she sought the DNA sample to investigate cold cases, a reasonable officer in Detective Boucher's position may well have thought there was a security reason for taking a DNA sample.

The distinctions asserted by the majority suggests that defendants would not have violated Friedman's right to privacy if the DNA sample had been taken pursuant to security reasons, but they did violate his rights because Attorney Luzaich subsequently voiced what the majority considers a less compelling reason. This, however, begs the question of whether Friedman had a reasonable expectation of privacy. If Friedman, because he is a repeat sex offender and because he was legally in custody, did not have a reasonable expectation of privacy, taking a DNA sample did not violate the constitution, regardless of the weight of the state's interest in doing so.[5]

Accordingly, I conclude that the defendants did not violate Friedman's Fourth Amendment rights.

### III.

We need not, however, determine whether the use of a buccal swab to take a DNA sample from Friedman was as a matter of law and fact a violation of the Fourth Amendment. The only issue before this court in this appeal is whether the defendants are entitled to qualified immunity. As noted by the majority, to determine whether a government employee is entitled to qualified immunity, we use a two-part test. *Saucier*

---

[5]This does not mean that a state could arbitrarily take a DNA sample by force. Rather, I do not think that the constitutionality of doing so turns on which of a state's valid interests is cited for taking a DNA sample from an incarcerated repeat sex offender.

*v. Katz*, 533 U.S. 194, 201 (2001). The initial question is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id*. Even if this question is answered in the affirmative, an employee is still entitled to qualified immunity if the constitutional right was not clearly established. *Id*. Recently, the Supreme Court indicated that the two-prongs need not always be answered in order. In *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), the Supreme Court stated that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

Even if one does not read our decisions in *Kriesel*, *Kincade* and *Rise* as authorizing a state to take a DNA sample from an incarcerated repeat sex offender for identification purposes, the defendants are entitled to qualified immunity because the law is not clearly established. To reject a defense of qualified immunity, the Supreme Court has instructed that we must find that "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Saucier*, 533 U.S. at 201-02.

Several decisions by the Supreme Court over the past three decades call into question whether inmates maintain any expectation of privacy under the Fourth Amendment. In *Bell v. Wolfish*, 441 U.S. 520, the Supreme Court assumed that convicted prisoners and pretrial detainees "retain some Fourth Amendment rights upon commitment to a corrections facility," and held nevertheless that they lose a right of privacy from unannounced searches of their cells and routine body cavity searches. *Id.* at 558-60; *see also Hudson v. Palmer*, 468 U.S. 517, 526 (1984) (noting that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell").

More recently, the Supreme Court in *Samson v. California*, 547 U.S. 843, indicated in *dicta* that individuals legally in custody may not have an expectation of privacy under the Fourth Amendment.[6] Applying a totality of the circumstances analysis, the Court held that the Fourth Amendment does not prohibit law enforcement from conducting a suspicionless search of a parolee who, under California law, was "subject to search or seizure by [law enforcement] at any time of the day or night, with or without a search warrant and with or without cause." *Id.* at 846. Critical to the Court's analysis was its conclusion that parolees have "severely diminished expectations of privacy by virtue of their status alone," which must yield to the substantial state interest of reducing recidivism. *Id.* at 851-54. The majority defended its determination that "parolees are more akin to prisoners than probationers" against the dissent's characterization that it was improperly "equat[ing] parolees with prisoners for the purpose of concluding that parolees, like prisoners, have no Fourth Amendment rights." *Id.* at 850 n.2 (citing *id.* at 861 (Stevens, J., dissenting) (explaining the majority's logic that "[p]risoners have no legitimate expectation of privacy; parolees are like prisoners; therefore, parolees have no legitimate expectation of privacy")). The Supreme Court's extension of case law concerning prisoners to cover parolees certainly suggests that case law concerning convicted prisoners applies to pre-trial detainees.

In light of these Supreme Court decisions, and our recent opinions, I think that a reasonable detective and prosecutor could well have thought that forcibly taking a buccal swap of

---

[6]We also have recognized that the contours of whether a prisoner has any Fourth Amendment rights are not clear. *See Somers v. Thurman*, 109 F.3d 614, 617-18 (9th Cir. 1997) (stating that the Supreme Court "may have intended to strip the inmates of all Fourth Amendment privacy rights"); *Thompson v. Souza*, 111 F.3d 694, 699 (9th Cir. 1997) ("The Supreme Court has not decided whether prison inmates retain rights cognizable under the Fourth Amendment.").

Friedman's inner check was justified.[7] I am not aware of any case that holds that a pre-trial detainee has a Fourth Amendment right to prevent the state from using a buccal swab to collect a DNA sample. As noted, circuit precedent recognizes that individuals in the lawful custody of the state cannot claim an expectation of privacy under the Fourth Amendment in their identification. *See Kincade*, 379 F.3d at 837; *Rise*, 59 F.3d at 1559-60 (recognizing that even the "merely accused" are subject to identification procedures). Moreover, the use of a buccal swab is, at most, an extremely minor intrusion upon a pretrial detainee's expectation of privacy in his bodily integrity, since he is subject to body cavity searches, strip searches, and blood draws. *See Kriesel*, 508 F.3d at 948; *Kincade*, 379 F.3d at 836-37; *Rise*, 59 F.3d at 1560. Although the defendants' actions may not have been in compliance with applicable state statutes governing the collection of DNA samples, there is no clearly established law that compels a conclusion that the defendants violated Friedman's Fourth Amendment rights.

Accordingly, although I would hold that Friedman has not suffered a Fourth Amendment violation, at a minimum, I would find that the defendants are entitled to qualified immunity because there is no clearly established law holding otherwise.

---

[7]The majority's observation that because the most recent relevant cases were decided after the buccal swap was taken in 2003, the defendants could not rely on those decisions to support their actions (Maj. Op. at 12546, n.8), is troubling for several reasons. First, it seems to assume that cases such as *Samson*, *Kincade*, and *Kriesel*, eroded an inmate's pre-existing Fourth Amendment right against having a buccal swap taken. Second, it suggests a focus on the intent of these particular defendants, instead of a reasonable officer. *See Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). Third, it would lead to problematic result of imposing civil liability on an officer for violating a constitutional right that the courts subsequently determined did not really exist.

**IV.**

This is an appeal from a grant of qualified immunity. In *Pearson*, the Supreme Court indicated that an appellate court of appeals could affirm a grant of qualified immunity if either of the two prongs of the *Saucier* test was not met. 129 S. Ct. at 818. I would find, that an in-custody repeat sex offender, like Friedman, does not have a reasonable expectation of privacy under the Fourth Amendment to prevent state authorities from using a buccal swab to take a DNA sample. However, even were the majority's contrary position reasonable, the grant of qualified immunity nonetheless should be affirmed because the alleged constitutional violation defined by the majority was not clearly established. Accordingly, I dissent from the majority's vacation of the district court's grant of qualified immunity.